**NATIONAL PETROLEUM REFINERS ASSOCIATION et al.**

v.

**FEDERAL TRADE COMMISSION et al., Appellants.**

**Environmental Defense Fund, Inc., Consumers Union, and Consumer Federation of America, Intervenors-Appellants.**

**No. 72–1446.**

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 12, 1972.

Decided June 27, 1973.

Rehearing Denied Aug. 6, 1973.

Ronald M. Dietrich, Gen. Counsel, F. T. C., of the bar of the Supreme Court of Illinois, pro hac vice, by special leave of court, with whom Harold H. Titus, Jr., U. S. Atty., Harold D. Rhynedance, Jr., Asst. Gen. Counsel, Miles J. Brown, Atty., F. T. C., and Morton Hollander and William D. Appler, Attys., Dept. of Justice, were on the brief, for appellants.

William Simon, Washington, D. C., with whom J. Wallace Adair, John Bodner, Jr., Francis A. O'Brien and Roger C. Simmons, Washington, D. C., were on the brief, for appellees.

Gladys Kessler, Washington, D. C., for intervenors-appellants.

Before BAZELON, Chief Judge, and WRIGHT and ROBINSON, Circuit Judges.

J. SKELLY WRIGHT, Circuit Judge.

This case presents an important question concerning the powers and procedures of the Federal Trade Commission. We are asked to determine whether the Commission, under its governing statute, the Trade Commission Act, 15 U.S. C. § 41 *et seq.* (1970), and specifically 15 U.S.C. § 46(g), is empowered to promulgate substantive rules of business conduct or, as it terms them, "Trade Regulation Rules." The effect of these rules would be to give greater specificity and clarity to the broad standard of illegality—"unfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce"—which the agency is empowered to prevent. 15 U.S.C. § 45(a). Once promulgated, the rules would be used by the agency in adjudicatory proceedings aimed at producing cease and desist orders against violations of the statutory standard. The central question in such adjudicatory proceedings would be whether the particular defendant's conduct violated the rule in question. *See* 16 C.F.R. § 1.-12(c) (1973).

The case is here on appeal from a District Court ruling that the Commission lacks authority under its governing stat-

ute to issue rules of this sort. National Petroleum Refiners Assn v. FTC, D.D. C., 340 F.Supp. 1343 (1972). Jurisdiction in the District Court was based on Section 10 of the Administrative Procedure Act. 5 U.S.C. § 706(2) (1970). Specifically at issue in the District Court was the Commission's rule declaring that failure to post octane rating numbers on gasoline pumps at service stations was an unfair method of competition and an unfair or deceptive act or practice.[1] The plaintiffs in the District Court, appellees here, are two trade associations and 34 gasoline refining companies. Plaintiffs attacked the rule on several grounds,[2] but the District Court disposed of the case solely on the question of the Commission's statutory authority to issue such rules. That is the only question presented for our consideration on appeal. We reverse and remand to the District Court for further consideration of appellees' challenge to the validity of the procedure before the Commission which resulted in the rule.

# I

■ Our duty here is not simply to make a policy judgment as to what mode of procedure—adjudication alone or a mixed system of rule-making and adjudication, as the Commission proposes—best accommodates the need for effective enforcement of the Commission's mandate with maximum solicitude for the interests of parties whose activities might be within the scope of the statutory standard of illegality. The Federal Trade Commission is a creation of Congress, not a creation of judges' contemporary notions of what is wise policy. The extent of its powers can be decided only by considering the powers Congress specifically granted it in the light of the statutory language and background. *See* Textile and Apparel Group v. FTC, 133 U.S.App.D.C. 353, 356–357, 410 F.2d 1052, 1055–1056, cert. denied, 396 U.S. 910, 90 S.Ct. 223, 24 L.Ed.2d 185 (1969). The question to be answered is "not what the [Commission] thinks it should do but what Congress has said it can do." CAB v. Delta Air Lines, 367 U.S. 316, 322, 81 S.Ct. 1611, 1617, 6 L. Ed. 869 (1961).

As always, we must begin with the words of the statute creating the Commission and delineating its powers. Section 5[3] directs the Commission to

1. The rule provides:
   "In connection with the sale or consignment of motor gasoline for general automotive use, in commerce as 'commerce' is defined in the Federal Trade Commission Act, it constitutes an unfair method of competition and an unfair or deceptive act or practice for refiners or others who sell to retailers, when such refiners or other distributors own or lease the pumps through which motor gasoline is dispensed to the consuming public, to fail to disclose clearly and conspicuously in a permanent manner on the pumps the minimum octane number or numbers of the motor gasoline being dispensed. In the case of those refiners or other distributors who lease pumps, the disclosure required by this section should be made as soon as it is legally practical; for example, not later than the end of the current lease period. Nothing in this section should be construed as applying to gasoline sold for aviation purposes.
   "NOTE: For the purposes of this section, 'octane number' shall mean the octane number derived from the sum of research (R) and motor (M) octane numbers divided by 2; $(R + M)/2$. The research octane (R) and motor octane number (M) shall be as described in the American Society for Testing and Materials (ASTM) 'Standard Specifications for Gasoline' D 439–70, and subsequent revisions, and ASTM Test Methods D 2699 and D 2700." 36 Fed.Reg. 23871 (1971).

2. In addition to arguing that the Commission lacked statutory authority to promulgate the rule, appellees also charged that the rule was an unconstitutional usurpation of Congress' legislative powers; that the procedures under which the rule was adopted deprived them of rights to a hearing allegedly guaranteed by § 5 of the Federal Trade Commission Act, the due process clause of the 5th Amendment, and the Administrative Procedure Act; that the rule lacks factual support; and that promulgating the rule was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.

3. 38 Stat. 719 *et seq.* (1914), as amended, 15 U.S.C. § 45 (1970).

"prevent persons, partnerships, or corporations * * * from using unfair methods of competition in commerce and unfair or deceptive acts or practices in commerce." [4] Section 5(b) of the Trade Commission Act specifies that the Commission is to accomplish this goal by means of issuance of a complaint, a hearing,[5] findings as to the facts, and issuance of a cease and desist order. The Commission's assertion that it is empowered by Section 6(g) to issue substantive rules defining the statutory standard of illegality in advance of specific adjudications does not in any formal sense circumvent this method of enforcement. For after the rules are issued, their mode of enforcement remains what it has always been under Section 5: the sequence of complaint, hearing, findings, and issuance of a cease and desist order. What rule-making does do, functionally, is to narrow the inquiry conducted in proceedings under Section 5(b). It is the legality of this practice which we must judge.

■ Appellees argue that since Section 5 mentions only adjudication as the means of enforcing the statutory standard, any supplemental means of putting flesh on that standard, such as rulemaking, is contrary to the overt legislative design. But Section 5(b) does not use limiting language suggesting that adjudication alone is the only proper means of elaborating the statutory standard. It merely makes clear that a Commission decision, after complaint and hearing, followed by a cease and desist order, is the way to force an offender to halt his illegal activities.[6] Nor are

---

4. 15 U.S.C. § 45(a)(6).

5. 15 U.S.C. § 45(b).

6. Section 5(b) provides:

"Whenever the Commission shall have reason to believe that any such person, partnership, or corporation has been or is using any unfair method of competition or unfair or deceptive act or practice in commerce, and if it shall appear to the Commission that a proceeding by it in respect thereof would be to the interest of the public, it shall issue and serve upon such person, partnership, or corporation a complaint stating its charges in that respect and containing a notice of a hearing upon a day and at a place therein fixed at least thirty days after the service of said complaint. The person, partnership, or corporation so complained of shall have the right to appear at the place and time so fixed and show cause why an order should not be entered by the Commission requiring such person, partnership, or corporation to cease and desist from the violation of the law so charged in said complaint. Any person, partnership, or corporation may make application, and upon good cause shown may be allowed by the Commission to intervene and appear in said proceeding by counsel or in person. The testimony in any such proceeding shall be reduced to writing and filed in the office of the Commission. If upon such hearing the Commission shall be of the opinion that the method of competition or the act or practice in question is prohibited by sections 41 to 46 and 47 to 58 of this title, it shall make a report in writing in which it shall state its findings as to the facts and shall issue and cause to be served on such person, partnership, or corporation an order requiring such person, partnership, or corporation to cease and desist from using such method of competition or such act or practice. Until the expiration of the time allowed for filing a petition for review, if no such petition has been duly filed within such time, or, if a petition for review has been filed within such time then until the record in the proceeding has been filed in a court of appeals of the United States, as hereinafter provided, the Commission may at any time, upon such notice and in such manner as it shall deem proper, modify or set aside, in whole or in part, any report or any order made or issued by it under this section. After the expiration of the time allowed for filing a petition for review, if no such petition has been duly filed within such time, the Commission may at any time, after notice and opportunity for hearing, reopen and alter, modify, or set aside, in whole or in part, any report or order made or issued by it under this section, whenever in the opinion of the Commission conditions of fact or of law have so changed as to require such action or if the public interest shall so require: *Provided, however,* That the said person, partnership, or corporation may,

we persuaded by appellees' argument that, despite the absence of limiting language in Section 5 regarding the role of adjudication in defining the meaning of the statutory standard, we should apply the maxim of statutory construction *expressio unius est exclusio alterius* and conclude that adjudication is the *only* means of defining the statutory standard. This maxim is increasingly considered unreliable, *see* Potomac Passngers Assn v. Chesapeake & Ohio R. Co., 154 U.S.App.D.C. 214, 220–222, 475 F.2d 325, 331–332 (1973), cert. granted, sub nom. Nat'l. R. R. Passenger Corp. v. Nat'l. Assn. of R. R. Passngers, 411 U. S. 981, 93 S.Ct. 2273, 36 L.Ed.2d 957 (1973), for it stands on the faulty premise that all possible alternative or supplemental provisions were necessarily considered and rejected by the legislative draftsmen. *See* American Trucking Assns v. United States, 344 U.S. 298, 309–310, 73 S.Ct. 307, 97 L.Ed. 337

(1953); Durnin v. Allentown Federal Savings & Loan Assn, E.D.Pa., 218 F. Supp. 716, 719 (1963). Here we have particularly good reason on the face of the statute to reject such arguments. For the Trade Commission Act includes a provision which specifically provides for rule-making by the Commission to implement its adjudicatory functions under Section 5 of the Act. Section 6(g) of the Act, 15 U.S.C. § 46(g), states that the Commission may "[f]rom time to time * * * classify corporations and * * * make rules and regulations for the purpose of carrying out the provisions of sections 41 to 46 and 47 to 58 of this title." [7]

According to appellees, however, this rule-making power is limited to specifying the details of the Commission's non-adjudicatory, investigative and informative functions spelled out in the other provisions of Section 6 [8] and should not be read to encompass substantive rule-

---

within sixty days after service upon him or it of said report or order entered after such a reopening, obtain a review thereof in the appropriate court of appeals of the United States, in the manner provided in subsection (c) of this section."

7. 15 U.S.C. § 45 is § 5 of the Trade Commission Act.

8. Section 6 of the Trade Commission Act provides:

The Commission shall also have power—

*(a) Investigation of corporations.*

To gather and compile information concerning, and to investigate from time to time the organization, business, conduct, practices, and management of any corporation engaged in commerce, excepting banks and common carriers subject to the Act to regulate commerce, and its relation to other corporations and to individuals, associations, and partnerships.

*(b) Reports by corporations.*

To require, by general or special orders, corporations engaged in commerce, excepting banks and common carriers subject to the Act to regulate commerce, or any class of them, or any of them, respectively, to file with the Commission in such form as the Commission may prescribe annual or spe-

cial, or both annual and special, reports or answers in writing to specific questions, furnishing to the Commission such information as it may require as to the organization, business, conduct, practices, management, and relation to other corporations, partnerships, and individuals of the respective corporations filing such reports or answers in writing. Such reports and answers shall be made under oath, or otherwise, as the Commission may prescribe, and shall be filed with the Commission within such reasonable period as the Commission may prescribe, unless additional time be granted in any case by the Commission.

*(c) Investigation of compliance with antitrust decrees.*

Whenever a final decree has been entered against any defendant corporation in any suit brought by the United States to prevent and restrain any violation of the antitrust Acts, to make investigation, upon its own initiative, of the manner in which the decree has been or is being carried out, and upon the application of the Attorney General it shall be its duty to make such investigation. It shall transmit to the Attorney General a report embodying its findings and recommendations as a result of any such investigation, and the report shall be made public in the discretion of the Commission.

making in implementation of Section 5 adjudications. We disagree for the simple reason that Section 6(g) clearly states that the Commission "may" make rules and regulations for the purpose of carrying out the provisions of Section 5 and it has been so applied. For example, the Commission has issued rules specifying in greater detail than the statute the mode of Commission procedure under Section 5 in matters involving service of process, requirements as to the filing of answers, and other litigation details necessarily involved in the Commission's work of prosecuting its complaints under Section 5. Such rulemaking by the Commission has been upheld. *See* Hunt Foods & Industries, Inc. v. FTC, 9 Cir., 286 F.2d 803, 810 (1960) ; United States v. San Juan Lumber Co., D.Colo., 313 F.Supp. 703, 708 (1969).

Moreover, the Supreme Court has ruled that the powers specified in Section 6 do not stand isolated from the Commission's enforcement and law-applying role laid out in Section 5. In United States v. Morton Salt Co., 338 U.S. 632, 70 S.Ct. 357, 94 L.Ed. 401 (1950), the Court unanimously rejected arguments that the powers in the two sections are to be exercised separately. There the Court upheld the Commission's power to utilize its authority under Section 6(b) to compel the filing of "special reports" to monitor a defendant's compliance with a cease and desist order issued under Section 5. The Commission sought information in such reports to supplement the reports the defendants had been ordered to file by the Court of Appeals which had affirmed the Commission's original cease and desist order. Finding the Commission's request squarely within a commonsense definition of a "special report," the Court reasoned that the power to compel "special reports" meant that the agency could "elicit any information beyond the ordinary data of a routine annual report." *Id.* at 650, 70 S.Ct. at 368. More importantly, the Court rejected arguments that the legislative history compelled an opposite result, pointing out that while the legislative history did not specifically underwrite this function of "special reports," neither did it explicitly "deny [their] use for any purpose within the duties of the Commission, including a § 5 proceeding." *Id.* at 649, 70 S.Ct. at 367. The Court concluded

---

*(d) Investigations of violations of antitrust statutes.*

Upon the direction of the President or either House of Congress to investigate and report the facts relating to any alleged violations of the antitrust Acts by any corporation.

*(e) Readjustment of business of corporations violating antitrust statutes.*

Upon the application of the Attorney General to investigate and make recommendations for the readjustment of the business of any corporation alleged to be violating the antitrust Acts in order that the corporation may thereafter maintain its organization, management, and conduct of business in accordance with law.

*(f) Publication of information; reports.*

To make public from time to time such portions of the information obtained by it hereunder, except trade secrets and names of customers, as it shall deem expedient in the public interest; and to make annual and special reports to the Congress and to submit therewith recommendations for additional legislation; and to provide for the publication of its reports and decisions in such form and manner as may be best adapted for public information and use.

*(g) Classification of corporations; regulations.*

From time to time to classify corporations and to make rules and regulations for the purpose of carrying out the provisions of sections 41 to 46 and 47 to 58 of this title.

*(h) Investigations of foreign trade conditions; reports.*

To investigate, from time to time, trade conditions in and with foreign countries where associations, combinations, or practices of manufacturers, merchants, or traders, or other conditions, may affect the foreign trade of the United States, and to report to Congress thereon, with such recommendations as it deems advisable.

15 U.S.C. § 46 (1970).

that the Trade Commission Act should be read as an "integrated whole." *Id.* at 650, 70 S.Ct. 357.

A similarly broad construction was given the Commission's powers in FTC v. Dean Foods Co., 384 U.S. 597, 86 S. Ct. 1738, 16 L.Ed.2d 802 (1966), where the Commission sought a temporary restraining order and a preliminary injunction against the consummation of a corporate merger against which it was proceeding under Section 5 of the Trade Commission Act and Section 7 of the Clayton Act.[9] The Supreme Court rejected arguments that the Commission lacked the specific authority under its enabling statute to move into court in advance of issuing a cease and desist order and that the Commission, having sought similar powers unsuccessfully from Congress, should not be granted them by judicial implication. *Id.* at 607–611, 86 S.Ct. 1738. The Court upheld the Commission's authority to petition Courts of Appeals to exercise their power under the All Writs Act, 28 U.S.C. § 1651(a) (1970), to preserve the *status quo* in merger cases pending Commission proceedings. Significantly, for our purposes here, the Court reasoned that, while the Commission was acting without specific statutory warrant, "[s]uch ancillary powers have always been treated as essential to the effective discharge of the Commission's responsibilities." *Id.* at 607, 86 S.Ct. at 1744.

Of course, it is at least arguable that these cases go no farther than to justify utilizing Section 6(g) to promulgate procedural, as opposed to substantive, rules for administration of the Section 5 adjudication and enforcement powers. But we see no reason to import such a restriction on the "rules and regulations" permitted by Section 6(g). On the contrary, as we shall see, judicial precedents concerning rule-making by other agencies and the background and purpose of the Federal Trade Commission Act lead us liberally to construe the

term "rules and regulations." The substantive rule here unquestionably implements the statutory plan. Section 5 adjudications—trial type proceedings—will still be necessary to obtain cease and desist orders against offenders, but Section 5 enforcement through adjudication will be expedited, simplified, and thus "carried out" by use of this substantive rule. And the overt language of both Section 5 and Section 6, read together, supports its use in Section 5 proceedings.

## II

Our belief that "rules and regulations" in Section 6(g) should be construed to permit the Commission to promulgate binding substantive rules as well as rules of procedure is reinforced by the construction courts have given similar provisions in the authorizing statutes of other administrative agencies. There is, of course, no doubt that the approved practices of agencies with similar statutory provisions is a relevant factor in arriving at a sound interpretation of the Federal Trade Commission's power here. *See* FTC v. Dean Foods Co., *supra,* 384 U.S. at 607, 86 S.Ct. 1738; FPC v. Texaco, Inc., 377 U.S. 33, 39–41, 84 S.Ct. 1105, 12 L.Ed.2d 112 (1964). In National Broadcasting Co. v. United States, 319 U.S. 190, 63 S.Ct. 997, 87 L.Ed. 1344 (1943), for example, the Supreme Court upheld the Federal Communications Commission's chain broadcasting rules regulating programming arrangements between networks and affiliates, in part on the basis of the FCC's generalized rule-making authority in 47 U.S.C. § 303(r) (1970). *See* 319 U.S. at 217, 63 S.Ct. 997. It rejected arguments similar to those made here, ruling that this authority extended beyond specification of technical and financial qualifications to be used as guides in the administration of the Commission's license-granting power. *Id.* at 220, 63 S.Ct. 997. It permitted the FCC to use rule-making to elaborate the

9. 64 Stat. 1125 (1914), as amended, 15 U.S.C. § 18 (1970).

terms of its mandate to pursue the "public convenience, interest, or necessity," 47 U.S.C. § 303, by framing rules carrying out public policy objectives like affiliate independence and avoidance of undue network control over programming in the hope that listeners would be ensured a diversity of program offerings.

United States v. Storer Broadcasting Co., 351 U.S. 192, 76 S.Ct. 763, 100 L. Ed. 1081 (1956), took the FCC's rule-making power a step further, holding that applicants for licenses could be rejected before receiving a hearing specified by statute, see 47 U.S.C. § 309(b) (1970), in the event they did not comply with the Commission's rule limiting networks' power to own stock in affiliates and did not give sufficient reasons why the rule should be waived. The Court held:

> "We do not read the hearing requirement, however, as withdrawing from the power of the Commission the rulemaking authority necessary for the orderly conduct of its business. * * *
>
> "* * * The Communications Act must be read as a whole and with appreciation of the responsibilities of the body charged with its fair and efficient operation. * * *"

351 U.S. at 202–203, 76 S.Ct. at 770. See also WBEN, Inc. v. United States, 2 Cir., 396 F.2d 601, cert. denied, 393 U.S. 914, 89 S.Ct. 238, 21 L.Ed.2d 200 (1968), upholding the FCC's alteration by rule-making of presunrise broadcasters' permissible operations even though the rule's effect was to modify license holders' operating powers without an individualized hearing specified for cases of license modification by 47 U.S.C. § 316 (1970); California Citizens Band Assn v. United States, 9 Cir., 375 F.2d 43 (1967), applying the Storer doctrine al-lowing rule-making to alter the powers of citizens radio service licensees without individualized hearings; Weinberger v. Hynson, Westcott & Dunning, Inc., 412 U.S. 609, 619–621, 93 S.Ct. 2469, 37 L.Ed.2d 207 (1973).

*Storer* and its successors are, of course, closely related to the question we face here. For a major component of appellees' complaint is the abridgement of their interest in having the Trade Commission Act's standard of illegality elaborated only in an adjudicatory context. In our view, this argument was adequately answered in *Storer*, at least to the extent the FTC's rule serves the "purpose of shortening and simplifying the adjudicative process and of clarifying the law in advance," [10] and thus, in *Storer's* language, aids the Commission in the "orderly conduct of its business." [11]

This obvious judicial willingness to permit substantive rule-making to undercut the primacy of adjudication in the development of agency policy is not limited to cases involving the FCC. The Federal Power Commission has successfully utilized rules regulating practical business conduct to frame, and even to cut off, what were once thought to be certificate applicants' absolute rights to individualized adjudications. This practice was upheld in large part on the authority of *Storer* in FPC v. Texaco, Inc., *supra.* Similarly, this court has upheld the authority of the Civil Aeronautics Board to utilize substantive rules affecting allocation of air cargo business among different types of air carriers to modify existing certificates without the full adjudicatory hearing contemplated by the agency's statute. *See* American Airlines, Inc. v. CAB, 123 U.S.App.D.C. 310, 359 F.2d 624 (1966) (*en banc*). *And see also* Air Lines Pilots Assn, Int. v. Quesada, 2 Cir., 276 F.2d 892 (1960),

---

10. Shapiro, The Choice of Rulemaking or Adjudication in the Development of Administrative Policy, 78 Harv.L.Rev. 921, 962 (1965). *See also* Weinberger v. Bentex Pharmaceuticals, Inc., 412 U.S. 645,

649–654, 93 S.Ct. 2488, 37 L.Ed.2d 235 (1973).

11. United States v. Storer Broadcasting Co., 351 U.S. 192, 202, 76 S.Ct. 763, 100 L.Ed. 1081 (1956).

upholding a Federal Aviation Agency regulation barring pilots from service after their 60th birthday without providing for individualized hearings on the resultant modification of their pilots' licenses. The propriety of using rule-making rather than adjudication alone to set substantive regulatory standards has also been approved under the Poultry Products Inspection Act which, like the Federal Trade Commission Act, authorizes an agency, there the Secretary of Agriculture, to promulgate rules and regulations, 21 U.S.C. § 463 (1970), and also provides for specific adjudicatory procedures to determine the existence of misleading food labels, 21 U.S.C. § 457 (1970). Borden Co. v. Freeman, D.N.J., 256 F.Supp. 592, affirmed, 3 Cir., 369 F.2d 404 (1966) (per curiam).[12]

Just as there has been little question of allowing substantive rule-making to intrude on asserted rights to a full hearing before an agency for a determination of a party's rights and liabilities, there has been a similar lack of hesitation in construing broad grants of rule-making power to permit promulgation of rules with the force of law as a means of agency regulation of otherwise private conduct. *See, e. g.*, American Trucking Assns v. United States, *supra*, upholding the Interstate Commerce Commission's authority under the Motor Carrier Act, 49 U.S.C. § 301 *et seq.* (1970), to promulgate rules regulating the use of leased equipment by authorized motor carriers; Morgan Stanley & Co. v. SEC, 2 Cir., 126 F.2d 325 (1942), upholding SEC rules involving underwriters' commissions in public utility offerings under the Public Utility Holding Company Act, 15 U.S.C. § 79a *et seq.* (1970). Indeed, the general rule courts have adopted toward agencies' use of rule-making power to define standards of conduct by regulated parties, where a general rule-making provision is in the agency statute, was stated succinctly and definitively for this court by Judge Fahy in Public Service Comm'n of State of New York v. FPC, 117 U.S.App.D.C. 195, 199, 327 F.2d 893, 897 (1964):

"All authority of the Commission need not be found in explicit language. Section 16 [the general rule-making provision] demonstrates a realization by Congress that the Commission would be confronted with unforeseen problems of administration in regulating this huge industry and should have a basis for coping with such confrontation. While the action of the Commission must conform with the terms, policies and purposes of the Act, it may use means which are not in all respects spelled out in detail. * * * "

The need to interpret liberally broad grants of rule-making authority like the one we construe here has been emphasized time and again by the Supreme Court. Just recently the Court upheld the authority of the Federal Reserve Board to promulgate rules under the Truth-in-Lending Act, 15 U.S.C. § 1601 *et seq.* (1970), specifying new cost and financing disclosure requirements for merchants selling goods payable in more than four installments. Mourning v. Family Publications Service, Inc., 411 U.S. 356, 93 S.Ct. 1652, 36 L.Ed.2d 318 (1973). One such rule, promulgated un-

12. *See also* Permian Basin Area Rate Cases, 390 U.S. 747, 774–777, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968) (upholding authority of FPC to adopt area maximum rate system against challenge that the Natural Gas Act, 15 U.S.C. § 717 *et seq.* (1970), permitted computation of natural gas producers' rates only on an individual basis) ; Weinberger v. Hynson, Westcott & Dunning, Inc., 412 U.S. 609, ——, 93 S.Ct. 2469, 37 L.Ed.2d 207 (1973) (upholding authority of Food & Drug Administration to issue declaratory orders classifying similar products as "new drugs" under § 5(e) of the Administrative Procedure Act, 5 U.S.C. § 554(e) (1970), against challenge that individualized proceedings involving each manufacturer were required) ; *cf.* Weinberger v. Bentex Pharmaceuticals, Inc., *supra* note 10, 412 U.S. at 649–652, 93 S.Ct. 2488 (endorsing FDA expert-drawn "monographs" to determine whether products are "new drugs" within the meaning of 21 U.S.C. § 321(p) (1) (1970).

der a general rule-making provision authorizing the Board to "prescribe regulations to carry out the purposes of [the Act]," 15 U.S.C. § 1604, was attacked on the ground that it was inconsistent with some portions of the statute, that the statute itself authorized a disclosure requirement with reference to transactions actually involving a finance charge, and that the Board was exceeding its authority and countermanding the statutory plan by using rule-making power to impose disclosure requirements on credit transactions where no finance charges are involved. Thus the challenge to the Federal Reserve Board's rule was in some respects similar to the challenge here: we are told that rule-making is authorized with reference to one part of the Federal Trade Commission Act but not another, that the statutory standard of illegality may be enforced only through the case-by-case adjudication specifically mentioned in Section 5 of the Act, and that the grant of rule-making power in Section 6(g) must not be extended to allow elaboration of the Section 5 standard in nonadjudicatory proceedings. But *Mourning* rejected this crabbed, inhospitable construction of a broad grant of rule-making authority, relying in large part on American Trucking Assns v. United States, *supra*:

"To accept respondent's argument would undermine the flexibility sought in vesting broad rule making authority in an administrative agency. In American Trucking Association[s] v. United States, 344 U.S. 298, [73 S. Ct. 307, 97 L.Ed. 337] (1953), we noted that it was not—

'a reasonable canon of interpretation that the draftsmen of acts delegating agency powers, as a practical and realistic matter, can or do include specific consideration of every evil sought to be corrected. . . . [N]o great acquaintance with practical affairs is required to know that such prescience, either in fact or in the minds of Congress, does not exist. Its very absence, moreover, is precisely one of the reasons why regulatory agencies such as the Commission are created, for it is the fond hope of their authors that they bring to their work the expert's familiarity with industry conditions which members of the delegating legislatures cannot be expected to possess.' 344 U.S., at 309–310, [73 S.Ct. at 314] (citations omitted).

Neither the sections of the Truth-in-Lending Act which refer specifically to transactions involving finance charges nor any other sections of the Act indicate that Congress attempted to list comprehensively all types of transactions to which the Board's regulations might apply. To the contrary, [the] broad grant of rule making authority [in 15 U.S.C. § 1604] reflects an intention to rely on those attributes of agency administration recognized in *American Trucking.* We cannot then infer that references in the Act to transactions involving credit charges were intended to limit the deterrent measures which the Board might choose."

411 U.S. at 372–373, 93 S.Ct. at 1662.

Thus there is little question that the availability of substantive rule-making gives any agency an invaluable resource-saving flexibility in carrying out its task of regulating parties subject to its statutory mandate. More than merely expediting the agency's job, use of substantive rule-making is increasingly felt to yield significant benefits to those the agency regulates. Increasingly, courts are recognizing that use of rule-making to make innovations in agency policy may actually be fairer to regulated parties than total reliance on case-by-case adjudication.

The Supreme Court made this suggestion initially in SEC v. Chenery Corp., 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947), where it dealt with an agency adjudication imposing novel restraints on the power of management of corporations to purchase stock during periods of reorganization under the Pub-

lic Utility Holding Company Act of 1935. While the Court did not hold that the Securities and Exchange Commission was bound to follow rule-making procedures in making such a marked policy departure, it was clearly aware that exclusive reliance on adjudication could be criticized for unfairly focusing on a single defendant in a restricted proceeding when promulgating a new policy with industry-wide ramifications. The Court said:

"* * * The function of filling in the interstices of the Act should be performed, as much as possible, through this quasi-legislative promulgation of rules to be applied in the future. * * *"

332 U.S. at 202, 67 S.Ct. at 1580.

Four years ago a majority of the Supreme Court hinted that there may be circumstances where agency policy innovations should be made *only* in rule-making proceedings. In NLRB v. Wyman-Gordon Co., 394 U.S. 759, 89 S.Ct. 1426, 22 L.Ed. 709 (1969), the Court upheld an adjudicatory order based on a prior decision where the Labor Board had decided that a new rule of management conduct during election campaigns should operate only prospectively. But the four-man plurality opinion by Mr. Justice Fortas sharply criticized the Board's initial promulgation in adjudicatory proceedings of a rule applicable in election campaigns generally. He argued that rule-making, under the Administrative Procedure Act's provisions for advance notice and broad public participation, 5 U.S.C. § 553 (1970), assured "fairness and mature consideration" in a way that adjudication, inevitably tending to focus more narrowly on the behavior of given parties, could not. 394 U.S. at 764, 89 S.Ct. 1426. Mr. Justice Douglas, dissenting from the majority's actual holding, argued similarly that where the Board imposed a new standard of conduct that is "not particularized to special facts * * * [but] is a statement of far-reaching policy covering all future representation elec-

tions," *id.* at 777, 89 S.Ct. at 1435, it should be required to follow the APA's rule-making procedures. He stressed that rule-making, unlike adjudication, "gives notice to an entire segment of society of those controls or regimentation that is forthcoming * * * [and] an opportunity for persons affected to be heard." *Ibid.*, 89 S.Ct. at 1436. And since the agency is bound under the APA to consider the submissions of those affected between the time a rule is proposed and when it is promulgated, 5 U.S.C. § 553(c), (d), it has a valuable opportunity to modify its initial inclinations. In other words, by exposing itself to a wider range of criticism and advice than is ordinarily available in adjudicatory proceedings the agencies may, in Mr. Justice Douglas' words, "discover that they are not always repositories of ultimate wisdom; they learn from the suggestions of outsiders and often benefit from that advice." *Id.* at 777–778, 89 S.Ct. 1436. Also dissenting, Mr. Justice Harlan said that where the agency had taken the position that its new adjudication-based rule was so revolutionary that it could be applied only prospectively, such marked departures in agency policy could only be taken through rule-making: "Either the rule-making provisions [of the APA] are to be enforced or they are not. Before the Board may be permitted to adopt a rule that so significantly alters pre-existing labor-management understandings, it must be required to conduct a satisfactory rule-making proceeding, so that it will have the benefit of wide-ranging argument before it enacts its proposed solution to an important problem." *Id.* at 781, 89 S.Ct. at 1438.

Even more recently, the Second Circuit has taken *Wyman-Gordon*'s suggestions to their logical conclusion. In Bell Aerospace Div. of Textron, Inc. v. NLRB, 2 Cir., 475 F.2d 485 (1973), that court refused to enforce a Labor Board bargaining order in part on the ground that the Board had made such a significant change in its previous definition of types of workers protected by the Na-

tional Labor Relations Act that rule-making rather than adjudication was required. In holding that the agency "should be particularly sure that it has all available information," 475 F.2d at 497, Chief Judge Friendly's opinion ordering rule-making, *id.* at 496, relied heavily on a factor stressed in the opinions of Justices Fortas, Douglas and Harlan in *Wyman-Gordon*—a sharp change in agency policy with obvious effects on a vastly wider range of parties than those immediately before the agency. *Id.* at 496–497. Moreover, he stressed that the argument for mandatory rule-making was especially strong where the defendant was exposed by the adjudicatory order to "new and unexpected liability." *Id.* at 497.

This judicial trend favoring rule-making over adjudication for development of new agency policy does not, of course, directly dispose of the question before us. There was no question that the SEC in *Chenery* had substantive rule-making powers. *See* 332 U.S. at 201, 67 S.Ct. 1575. And *Wyman-Gordon* assumed that the NLRB also had substantive rule-making powers under 29 U.S.C. § 156 (1970). 394 U.S. at 763–765 & n. 3, 89 S.Ct. 1426. Here we must decide just that question, whether Congress has given the FTC the same alternate means of proceeding, not whether the FTC should be required to use rule-making in some circumstances. But *Chenery, Wyman-Gordon* and *Bell Aerospace* cannot be ignored, for they indisputably flesh out the contemporary legal framework in which both the FTC and this court operate and which we must recognize. *See* Moragne v. States Marine Lines, Inc., 398 U.S. 375, 390–391, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970). To us, these cases suggest that contemporary considerations of practicality and fairness—specifically the advisability of utilizing the Administrative Procedure Act's rule-making procedures to provide an agency about to embark on legal innovation with all relevant arguments and information, 5 U.S.C. § 553—certainly support the Commission's position here. As *Wyman-Gordon* and *Bell Aerospace* explicitly noted, utilizing rule-making procedures opens up the process of agency policy innovation to a broad range of criticism, advice and data that is ordinarily less likely to be forthcoming in adjudication. Moreover, the availability of notice before promulgation and wide public participation in rule-making avoids the problem of singling out a single defendant among a group of competitors for initial imposition of a new and inevitably costly legal obligation, *cf.* Weinberger v. Bentex Pharmaceuticals, Inc., 412 U.S. 645, 652–654, 93 S.Ct. 2488, 37 L.Ed.2d 235 (1973); Weinberger v. Hynson, Westcott & Dunning, Inc., *supra,* 412 U.S. at 625–628, 93 S.Ct. 2469; FTC v. Universal-Rundle Corp., 387 U.S. 244, 87 S.Ct. 1622, 18 L.Ed.2d 749 (1967); Moog Industries, Inc. v. FTC, 355 U.S. 411, 78 S.Ct. 377, 2 L.Ed.2d 370 (1958).

Such benefits are especially obvious in cases involving initiation of rules of the sort the FTC has promulgated here. The Commission's statement on basis and purpose indicated that the decision to impose the obligation of octane rating disclosure on gasoline dealers entailed careful consideration of automobile engine requirements, automobile dealers' practices in instructing purchasers how to care for their engines, consumer gasoline purchasing habits, and costs to gasoline dealers. In addition, the Commission had to choose exactly what kind of disclosure was the fairest. In short, a vast amount of data had to be compiled and analyzed, and the Commission, armed with these data, had to weigh the conflicting policies of increasingly knowledgeable consumer decision-making against alleged costs to gasoline dealers which might be passed on to the consumer. True, the decision to impose a bright-line standard of behavior might have been evolved by the Commission in a single or a succession of adjudicatory proceedings, *see, e. g.,* FTC v. Texaco, Inc., 393 U.S. 223, 89 S.Ct. 429, 21 L. Ed.2d 394 (1968), much as the Supreme Court has imposed *per se* rules of busi-

ness behavior in antitrust cases. *See, e. g.,* United States v. Topco Associates, Inc., 405 U.S. 596, 92 S.Ct. 1126, 31 L. Ed.2d 515 (1972) (horizontal territorial restraints); United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940) (price fixing). But evolution of bright-line rules is often a slow process and may involve the distinct disadvantage of acting without the broad range of data and argument from all those potentially affected that may be flushed out through use of legislative-type rule-making procedures. *Cf.* United States v. Topco Associates, Inc., *supra,* 405 U.S. at 620, 92 S.Ct. 1126 (Mr. Chief Justice Burger, dissenting). And utilizing rule-making in advance of adjudication here minimizes the unfairness of using a purely case-by-case approach requiring "compliance by one manufacturer while his competitors [engaging in similar practices] remain free to violate the Act." Weinberger v. Bentex Pharmaceuticals, Inc., *supra,* 412 U.S. at 653, 93 S.Ct. at 2494. In light of *Chenery, Wyman-Gordon* and *Bell Aerospace,* therefore, it is hard to escape noting that the policy innovation involved in this case underscores the need for increased reliance on rule-making rather than adjudication alone.

### III

Appellees contend, however, that these cases and the general practice of agencies and courts in underwriting the broad use of rule-making are irrelevant to the FTC. They argue that the Trade Commission is somehow *sui generis,* that it is best characterized as a prosecuting rather than a regulatory agency, and that substantive rule-making power should be less readily implied from a general grant of rule-making authority where the agency does not stand astride an industry with pervasive license-granting, rate-setting, or clearance functions. Initially it should be noted that appellees, for obvious reasons, do not rely on the NLRB in making their prosecutorial argument. The statutory method of adjudication and enforcement used by the NLRB is, of course, very similar to that of the FTC. *Compare* 29 U.S.C. § 160 (1970) *with* 15 U.S.C. § 45. And the courts, including the Supreme Court, have, as shown in the preceding section, repeatedly encouraged the NLRB to make use of its general grant of rule-making authority, 29 U.S.C. § 156, to issue substantive rules. We do not assert that the FTC is compelled by its statutory charter to exert the kind of ongoing regulatory scrutiny exercised by agencies like the FCC, FPC, ICC, SEC, CAB, or even the Department of Agriculture. But we do not find the absence of license-granting, rate-making or clearance power a sufficiently principled distinction to accept appellees' argument. For a more compelling argument can be made that the FTC's duty to prevent "unfair methods of competition" and "unfair or deceptive acts or practices" is just as potentially pervasive, in the sense of affecting commercial practices, as the regulatory schemes of agencies utilizing rate-making, licensing, and similar means of regulation. The FTC's charter to prevent unfair methods of competition is tantamount to a power to scrutinize and to control, subject of course to judicial review, the variety of contracting devices and other means of business policy that may contradict the letter or the spirit of the antitrust laws. FTC v. Brown Shoe Co., 384 U.S. 316, 320–322, 86 S.Ct. 1501, 16 L.Ed.2d 587 (1966); FTC v. Motion Picture Advertising Service Co., 344 U.S. 392, 394–395, 73 S.Ct. 361, 97 L.Ed. 426 (1953); FTC v. Cement Institute, 333 U.S. 683, 689–695, 68 S.Ct. 793, 92 L.Ed. 1010 (1948). The pervasiveness of the antitrust laws' coverage, in the sense of affecting business decision-making, needs no elaboration. Suffice it to say that it cuts deeply into and, with limited exceptions,[13] widely across virtually all

---

13. The Federal Trade Commission Act exempts from its coverage banks, common carriers subject to other federal regulation, air carriers and foreign air car-

of American business. In addition, under its mandate to prevent "unfair or deceptive acts or practices," the Commission has the responsibility to protect the consumer from being misled by governing the conditions under which goods and services are advertised and sold to individual purchasers. *See* FTC v. Sperry & Hutchinson Co., 405 U.S. 233, 239–244, 92 S.Ct. 898, 31 L.Ed. 170 (1972). And while the boundaries of the Commission's power to proscribe conduct it deems harmful to the consumer or to competition are not clearly defined, they are indeed expansive. *Id.* at 244, 92 S.Ct. 898.

Given the expanse of the Commission's power to define proper business practices, we believe it is but a quibble to differentiate between the potential pervasiveness of the FTC's power and that of the other regulatory agencies merely on the basis of its prosecutorial and adjudicatory mode of proceeding. Like other agencies, wholly apart from the question of rule-making power it exerts a powerfully regulatory effect on those business practices subject to its supervision. Of course, its regulatory authority is not complete. But neither is the regulation · exercised by other agencies. *See* J. I. Case Co. v. Borak, 377 U.S. 426, 432, 84 S.Ct. 1555, 12 L. Ed.2d 423 (1964). And the Commission has this regulatory effect irrespective of whether it chooses to elaborate the vague but comprehensive statutory standards through rule-making or through case-by-case adjudication. Businesses whose practices appear clearly covered by the Trade Commission's adjudicatory decisions against similarly situated parties presumably will comply with the Commission's holding rather than await a Commission action against them individually; we must presume that in many cases where a guideline is laid down in an individual case it is, like many common law rules, generally obeyed by those

similarly situated. Moreover, there are ample indications in the Commission's legislative history that the agency, by gathering information on business practices, issuing periodic reports, and moving against those practices which appear "unfair," was meant to have just this sort of regulatory impact, despite the purely prosecutorial mode of proceeding provided in Section 5 of the Act.[14] Not only is the Commission's regulatory power much broader than appellees would have us believe; there is simply no compelling evidence in the Act's legislative history or in the language of the statute itself which would limit the exercise of that power to the prosecutorial function or prevent the Commission from making that function more effective by rule-making.

## IV

Although we believe there are thus persuasive considerations for accepting the FTC's view that the plain meaning of the statute supports substantive rule-making, the question is not necessarily closed. For appellees' contention—that the phrase "rules and regulations for the purpose of carrying out" Section 5 refers only to rules of procedure and practice for carrying out the Commission's adjudicatory responsibility—is not implausible. The opinion of the District Court argues forcefully that, in spite of the clear and unlimited language of Section 6(g) granting rule-making authority to the Commission, the Congress that enacted Section 5 and Section 6(g) gave clear indications of its intent to reject substantive rule-making, that the FTC's own behavior in the years since that time supports a narrow interpretation of its mandate to promulgate "rules and regulations," and that where Congress desired to give the FTC substantive rule-making authority in discrete areas it did so in subsequent years in unambiguous terms. Our own conclusion,

riers subject to the Federal Aviation Act of 1958, and persons subject to the Packers and Stockyards Act of 1921. *See* 15 U.S.C. § 45(a)(6).

14. *See, e. g.,* S.Rep. No. 597, 63d Cong., 2d Sess., 9–10 (1914); H.R.Rep. No. 1142, 63d Cong., 2d Sess., 18–19 (1914).

based on an independent review of this history, is different. We believe that, while the legislative history of Section 5 and Section 6(g) is ambiguous, it certainly does not compel the conclusion that the Commission was not meant to exercise the power to make substantive rules with binding effect in Section 5(a) adjudications. We also believe that the plain language of Section 6(g), read in light of the broad, clearly agreed-upon concerns that motivated passage of the Trade Commission Act, confirms the framers' intent to allow exercise of the power claimed here. We do not find the District Court's reliance on the agency's long-standing practice, until 1962, of not utilizing rule-making or the District Court's reliance on enactment of specific grants of rule-making power in narrow areas sufficiently persuasive to override our view, and the Commission's view, that rule-making is not only consistent with the original framers' broad purposes, but appears to be a particularly apt means of carrying them out.

In analyzing the origins of the Federal Trade Commission Act of 1914, and Section 5 and 6(g) in particular, both parties would have us focus heavily on the floor debates and committee reports that accompanied the legislation on its tortuous path toward enactment. Certainly these materials are relevant to our inquiry and cannot be ignored. But our examination of the comments made by legislators that allegedly bear directly on the question whether the Commission was initially meant to exercise substantive, legislative-type rule-making power has led us to the conclusion, familiar in cases dealing with strongly contested questions of statutory interpretation, that the *specific* intent of Congress here cannot be stated with any assurance. The materials cited to us indicate that the question before us—whether the Commission can elaborate the meaning of Section 5's standard of illegality through rule-making as well as through case-by-case adjudication—was not confronted straightforwardly and decisively. Given this conclusion, which we elaborate in detail in the appendix to this opinion, we are hardly at liberty to override the plain, expansive language of Section 6(g) as well as the gloss that has been placed on that kind of rule-making provision by the series of decisions dealing with agencies whose enabling statutes have similar rule-making provisions. *See* United States v. Oregon, 366 U.S. 643, 647–648, 81 S.Ct. 1278, 6 L.Ed.2d 575 (1961).

Moreover, while we believe the historical evidence is indecisive of the question before us, we are convinced that the broad, undisputed policies which clearly motivated the framers of the Federal Trade Commission Act of 1914 would indeed be furthered by our view as to the proper scope of the Commission's rule-making authority. The multiplicity of differing plans proposed for a trade commission prior to 1914[15] and during

---

15. *See* S. 2941, 62d Cong., 2d Sess. (1911). This bill, introduced by Senator Newlands of Nevada, then a ranking member of the Senate Commerce Committee, provided for a 5-man independent commission whose presidentially appointed members would have fixed tenure, with powers to compel corporations whose annual gross receipts exceeded $5 million to furnish annual reports showing their "organization, financial condition, and operations as may be prescribed by regulations to be made in pursuance of this act." Such corporations, moreover, would be subject to a federal registration requirement, and registration could be revoked upon a commission finding that they had engaged in "unfair or oppressive methods of competition," or suffered from "overcapitalization" or "improper financial organization." Application of these standards to the facts of any given corporation was left to the commission. Finally, the commission was empowered under the plan to order that a defendant corporation found liable "thereafter shall not engage in interstate commerce." This order was enforceable by fine and injunction in the federal district courts. Although this stringent legislation was not voted upon during the session, it does serve to indicate serious unease with the existent policy of entrusting the courts with exclusive responsibility for antitrust enforcement. A subsequent proposal, S. 5485, 62d Cong., 2d Sess.

the intensive debates in 1914[16] immediately preceding enactment of the Trade Commission Act demonstrates, of course, that proponents of the agency were hardly agreed on exactly what powers the agency should assume. But the variety of plans and the proponents of the agency all unquestionably shared deep objections to the existing structure of judicial monopolization of cases involving unfair, anticompetitive business practices. Those who believed from the start in a commission with independent enforcement powers,[17] as the Commis-

(1912), provided for a commission without any independent enforcement authority, but with powers to investigate and report publicly on corporate financial and business practices, to recommend antitrust prosecutions to the Department of Justice, and to assist the federal courts, as a sort of special master, in framing decrees of dissolution or reorganization once underlying antitrust liability under the Sherman Act had been found. Stronger legislation was introduced in the House in 1913, H.R. 9299, H.R. 9300 & H.R. 9301, 63d Cong., 1st Sess. (1913), by the Progressive Party leader, Congressman Murdock of Kansas. These bills would create a commission with power to issue orders restraining unfair competitive practices that would be enforceable in federal courts, but these bills too were not reported to the floor. Moreover, the platforms of both the Republican and the Progressive Parties in the 1912 election called for establishment of a commission. The Republicans called for a "Federal trade commission, thus placing in the hands of an administrative board many of the functions now necessarily exercised by the courts. This will promote promptness in the administration of the laws and avoid delays and technicalities incident to court procedure." Quoted in H.R. Rep. No. 553, 63d Cong., 2d Sess., Views of the Minority, 1 (1914). The Progressives called for a "commission of high standing, which shall maintain permanent active supervision over industrial corporations engaged in interstate commerce, * * * doing for them what the Government now does for national banks, and what is now done for the railroads by the Interstate Commerce Commission." Quoted in *id.*, Part 3, at 2. The 1912 Democratic platform signally failed to promote a trade commission, though it did call for greater specificity in the antitrust laws. *See* G. Henderson, The Federal Trade Commission: A Study in Administrative Law and Procedure 16 (1924). The reluctance of the Democrats, including President Wilson, to embrace plans for an independent commission was based on several grounds. First, throughout his campaign Mr. Wilson opposed creation of a new agency to supervise corporate behavior simply on the ground that additional bureaucracy was undesirable *per se.* *See* A. Link, Wilson: The New Freedom 327 (paper ed. 1956). Second, the Progressive Party plan for a commission treating large trusts as corporations with a "public use" appeared to contemplate an extraordinary degree of regulation, including licensing and price control. Such supervision raised the spectre of possible governmental immunization, through regulation, of monopolistic practices from more straightforward legal attack. *See* G. Henderson, *op. cit. supra*, at 22–24.

16. *See* Appendix at pp. 698–700 *infra.*

17. Senator Newlands, for example, stated in a hearing before the Senate Committee on Interstate Commerce on Aug. 4, 1911, that his bill, S. 2941, *supra* note 15, would allow the commission to achieve ends that had eluded the courts:

"* * * We want traditions; we want a fixed policy; we want trained experts; we want precedents; we want a body of administrative law built up. This can not be well done by the single occupant of an office, subject to constant changes in its incumbency and subject to higher executive authority. Such work must be done by a board or commission of dignity, permanence, and ability, independent of executive authority, except in its selection, and independent in character."

Quoted in Appendix to S. Rep. No. 597, *supra* note 14, at 22.

President Wilson did not originally back proposals giving a trade commission independent enforcement power. When he announced his antitrust program in an address to Congress on Jan. 20, 1914, 51 Cong.Rec. (Part 2) 1963 (1914), he relented his campaign opposition to any new commission. But the agency he proposed had no independent enforcement power, as had been proposed in 1911 and 1913, *see* note 15 *supra*, and was clothed with merely investigative and publicity powers, "a clearing house for the facts by which both the public mind and the managers of great business undertakings should be guided," 51 Cong.Rec. (Part 2) at 1963. He also proposed permitting the commission to assist the courts and the Justice Department in framing decrees

sion was finally given in the 1914 legislation, and those who believed the Commission should have lesser powers,[18] agreed that entrusting enforcement of

and settlements. IIis rejection of an agency with its own enforcement power was seemingly based on fears that it might thus be "empowered to make terms with monopoly or * * * to assume control of business." *Ibid.*

Those who felt that Wilson did not go far enough sharply disagreed with the President's apparent willingness to leave powers of enforcement exclusively to the courts. Congressman Stevens of New Hampshire, whose views subsequently helped change the President's opposition to a commission with independent enforcement power, *see* A. Link, *op. cit. supra* note 15, at 436–438, refused to sign the majority report of the House Committee on Interstate Commerce when it reported out the Administration's original proposal for a commission without any independent enforcement power. He stressed that the "regulation of large corporations by suits at law is a slow, costly process and even where the Government has eventually won, the results have been most disappointing," and that only an "administrative board having general power to prevent unfair competitive practices" could ameliorate this problem. H.R. Rep. No. 533, *supra* note 15, Part 2 at 1. On the House floor, members who opposed the President's bill on the ground that it gave the commission insufficient power made similar arguments, namely, that the commission, as proposed, simply did not strike at the core problem of antitrust enforcement. Congressman Murdock of Kansas, a leading Progressive, sharply attacked the original Administration plan:

> "The pending Democratic measures, save for a mere rudimentary and purely investigative trade commission, which is to go hunting in the trust jungles —with a camera—leave all the work to the lingering, laborious, inexpert adjustments of the overcrowded courts."

51 Cong.Rec. (Part 9) 8973 (1914). Murdock argued that the Administration's supplement to its original trade commission proposal, a set of laws specifying in greater detail anticompetitive practices, was defective precisely because the new proposals were to be "enforced only by the long, difficult, delaying processes of the courts." *Id.* at 8974. Congressman Dillon of South Dakota, another proponent of a stronger commission, argued that giving enforcement power to the commission would avoid this problem:

> "* * * If we rely on the judiciary, our progress must necessarily be slow. We prefer to place our hopes and aspirations in an administrative board, a board that would not be hampered by appeals, delays, and technicalities."

*Id.* at 9057.

Criticism of exclusive reliance on judicial enforcement of the antitrust laws was equally evident when Wilson changed his mind after passage of the weak commission bill in the House and backed a commission with independent enforcement authority. *See generally* Appendix at pp. 700–702 *infra.* The report of the Senate Commerce Committee, chaired by Newlands, endorsing the latter plan argued that a commission composed of members familiar with the problems of business competition "could be vastly more effectual than through the courts alone, which in most cases will take no cognizance of violations of the law for months or years after the violations occurred, and when the difficulty of awarding reparation for the wrong is almost unsurmountable." S. Rep. No. 597, *supra* note 14, at 5–6. During the subsequent floor debate, Senator Saulsbury of Delaware, who subsequently served on the conference committee which produced the final bill, argued in favor of a commission with its own enforcement power on the ground that "[t]he delays and expense incident to obtaining redress for such wrongs in the courts have made adequate relief to litigants almost unattainable in these cases and, in the public mind there has been growing up a belief, which to some extent may be justified, that the courts were not efficient, because of the usual delay and expense in providing early, adequate, and inexpensive relief from oppressions." 51 Cong.Rec. (Part 12) 11593 (1914).

18. Congressman Covington of Maryland, the floor manager of the Administration's original proposal which gave the commission no independent enforcement power, said as much on the House floor shortly after a bill embodying the Administration's plans was reported out from committee when he described the problems that ensued in attempting to render a decree of dissolution in one notable antitrust case:

> "* * * [B]y reason of the lack of an efficient body charged with the handling of the numerous facts relating to all those tobacco concerns and assisting the court, a delay was caused and

congressional policy to prevent undue incursions on competition exclusively to the courts was a serious mistake. The courts were said to lack sufficient expertise in matters of economic complexity,[19] their decisions were said to be wanting in the clarity planners of complicated business transactions and innovations required,[20] and finally and most importantly, the courts lacked both the resources and the skill to proceed with speed and expedition in the trial and disposition of complicated cases involving economic questions.[21] This concern over judicial delay, inefficiency and uncertainty was echoed time and again throughout the 1914 debates over the form a commission would take.[22]

■■ In determining the legislative intent, our duty is to favor an interpretation which would render the statutory design effective in terms of the policies behind its enactment and to avoid an interpretation which would make such policies more difficult of fulfillment, particularly where, as here, that interpretation is consistent with the plain language of the statute. *See* Bird v. United States, 187 U.S. 118, 124, 23 S.Ct. 42, 47 L.Ed. 100 (1902); United States v. Blasius, 2 Cir., 397 F.2d 203, 207 n. 9 (1968), cert. dismissed, 393 U.S. 1008, 89 S.Ct. 615, 21 L.Ed.2d 557 (1969). "[I]n the absence of an unmistakable directive," we cannot "construe the Act in a manner which runs counter to the broad goals which Congress intended it

to effectuate." FTC v. Fred Meyer, Inc., 390 U.S. 341, 349, 88 S.Ct. 904, 908, 19 L.Ed.2d 1222 (1968). Indeed, as Mr. Justice Harlan put it in a case involving a question of the Federal Power Commission's power under a general rule-making provision to alter radically its customary modes of proceeding, "This Court has repeatedly held that the width of administrative authority must be measured in part by the purposes for which it was conferred." Permian Basin Area Rate Cases, 390 U.S. 747, 776, 88 S.Ct. 1344, 1364, 20 L.Ed.2d 312 (1968); *see also id.* n. 40; Thorpe v. Housing Authority of the City of Durham, 393 U.S. 268, 277–281, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969) (upholding rules of the United States Department of Housing and Urban Development promulgated pursuant to a rule-making provision, 42 U.S.C. § 1408 (1970), phrased in terms almost identical with those of Section 6(g) of the Trade Commission Act). This view was reiterated just a few weeks ago by Mr. Chief Justice Burger, writing for the Court:

"* * * Where the empowering provision of a statute states simply that the agency may 'make . . . such rules and regulations as may be necessary to carry out the provisions of this Act,' we have held that the validity of a regulation promulgated thereunder will be sustained so long as it is 'reasonably related to the purposes of the enabling legislation.' * * *"

---

an imperfect decree resulted. If Judge Lacombe had been able to refer to a commission of the sort now proposed the whole record in the case and obtain a report concerning the form of a proper constructive decree of dissolution, the public would have been more speedily and more effectively served." 51 Cong.Rec. (Part 9) at 8846–8847. The Senate Commerce Committee, while it decided not to report S. 5485, discussed at note 15 *supra*, noted that the bill's feature of permitting the commission to act as a sort of special master in assisting the federal courts to frame decrees of dissolution or settlement in Sherman Act cases would serve as a partial cure for "judicial deliberation and delay," en-

suring that violations would be promptly attacked and remedies imposed quickly if they were needed. S.Rep. No. 1326, 62d Cong., 3d Sess. (1913), quoted in Appendix to S.Rep. No. 597, *supra* note 14, at 33.

19. *See* statements of Senator Newlands and Congressman Murdock, quoted in note 17 *supra*. *See also* H.R.Rep. No. 1142, *supra* note 14, at 19; S.Rep. No. 597, *supra* note 14, at 6, 8–10, 12, 13.

20. *See generally* G. Henderson, *op. cit. supra* note 15, at 11–15.

21. *See* note 17 *supra*.

22. *See* notes 17–19 *supra*.

Mourning v. Family Publications Service, Inc., *supra,* 411 U.S. at 369, 93 S.Ct. 1660–1661. (Footnote omitted.) In short, where a statute is said to be susceptible of more than one meaning, we must not only consult its language; we must also relate the interpretation we provide to the felt and openly articulated concerns motivating the law's framers. *See* J. I. Case Co. v. Borak, *supra,* 377 U.S. at 432–433, 84 S.Ct. 1555. In this way we may be sure we are construing the statute rather than constructing a new one.

The problems of delay and inefficiency that proponents of both a strong and a weak commission aimed to eliminate or minimize have plagued the Trade Commission down to the present. While the Commission has broad common law-like authority to delineate the scope of the statute's prohibitions, *see* FTC v. Sperry & Hutchinson Co., *supra,* 405 U.S. at 244, 92 S.Ct. 898, like the federal courts it was designed to supplement, it has remained hobbled in its task by the delay inherent in repetitious, lengthy litigation of cases involving complex factual questions under a broad legal standard. Close students of the agency agree that the historic case-by-case purely adjudicatory method of elaborating the Section 5 standard and applying it to discrete business practices has not only produced considerable uncertainty, *see* Report of the ABA Commission to Study the Federal Trade Commission 11 (1969); Auerbach, The Federal Trade Commission: Internal Organization and Procedure, 48 Minn.L.Rev. 383, 445–449, 464–465, 518–519 (1964); Cushman, The Problem of the Independent Regulatory Commissions 24 *in* President's Com'n on Administrative Management, Studies No. 1–5 (1937); Baum, Reorganization, Delay and the Federal Trade Commission, 15 Admin.L.Rev. 92, 93, 108–110 (1963), but also has helped to spawn litigation the length of which has frequently been noted ruefully by com-

mentators on the Commission's performance. *See* Note, The Federal Trade Commission and Reform of the Administrative Process, 62 Colum.L.Rev. 671, 692–693 (1962); Report of the ABA Commission to Study the Federal Trade Commission, *supra,* at 10, 28–32. We believe that, to the extent substantive rule-making to implement Section 5 proceedings is likely to deal with these problems given the statutory authority provided in Section 6(g), the Commission's position should be upheld as a reasonable means of attacking ills the Commission was created to cure.

There is little disagreement that the Commission will be able to proceed more expeditiously, give greater certainty to businesses subject to the Act, and deploy its internal resources more efficiently with a mixed system of rule-making and adjudication than with adjudication alone. With the issues in Section 5 proceedings reduced by the existence of a rule delineating what is a violation of the statute or what presumptions the Commission proposes to rely upon, proceedings will be speeded up. For example, in an adjudication proceeding based on a violation of the octane rating rule at issue here, the central question to be decided will be whether or not pumps owned by a given refiner are properly marked. *See also* pages 691–692 *infra.* Without the rule, the Commission might well be obliged to prove and argue that the absence of the rating markers in each particular case was likely to have injurious and unfair effects on consumers or competition.[23] Since this laborious process might well have to be repeated every time the Commission chose to proceed subsequently against another defendant on the same ground, the difference in administrative efficiency between the two kinds of proceedings is obvious. Furthermore, rules, as contrasted with the holdings reached by case-by-case adjudication, are more specific as to their scope, and industry com-

---

23. *See* Case Note, 14 B.C.Ind. & Comm.L. Rev. 368, 379 (1972). *But cf.* FTC v. Texaco, Inc., 393 U.S. 223, 89 S.Ct. 429, 21 L.Ed.2d 394 (1968).

pliance is more likely simply because each company is on clearer notice whether or not specific rules apply to it.

Moreover, when delay in agency proceedings is minimized by using rules, those violating the statutory standard lose an opportunity to turn litigation into a profitable and lengthy game of postponing the effect of the rule on their current practice.[24] As a result, substantive rules will protect the companies which willingly comply with the law against what amounts to the unfair competition of those who would profit from delayed enforcement as to them. This, too, will minimize useless litigation and is likely to assist the Commission in more effectively allocating its resources. In addition, whatever form rules take, whether bright-line standards or presumptions that are rebuttable, they are likely to decrease the current uncertainty many businesses are said to feel over the current scope and applicability of Section 5.[25] But the important point here is not that rule-making is assuredly going to solve the Commission's problems. It is rather than recognition and use of rule-making by the Commission is convincingly linked to the goals of agency expedition, efficiency, and certainty of regulatory standards that loomed in the background of the 1914 passage of the Federal Trade Commission Act.

This relationship between rule-making's probable benefits and the broad concerns evident when the FTC was created, together with the express language of Section 6(g), help persuade us that any purported ambiguity of the statute be resolved in favor of the Commission's claim. "In a case much more clouded with doubts than this one, we held that we would not 'in the absence of compelling evidence that such was Con-

gress' intention . . . prohibit administrative action imperative for the achievement of an agency's ultimate purposes.' Permian Basin Area Rate Cases, 390 U.S. 747, 780, 88 S.Ct. 1344, 1367, 20 L.Ed.2d 312." Weinberger v. Bentex Pharmaceuticals, Inc., *supra,* 412 U.S. at 653, 93 S.Ct. at 2494.

V

Despite the import of Section 6(g)'s plain language, the overwhelming judicial support given to expansive agency readings of statutory rule-making authorizations that are not flatly inconsistent with other statutory provisions, and the incontestable relationship between the broad policies behind the 1914 Act and the utility of substantive rule-making power, appellees argue that substantive rule-making represents a sufficiently important innovation in Commission practice for us to balk at authorizing its use on the basis of an arguably ambiguous statute in the absence of very firm indications of affirmative and specific legislative intent. Indeed, courts have assumed such a stance toward novel assertions of agency powers. This court did so in Textile and Apparel Group v. FTC, *supra,* where we reviewed an agency rule allowing for *ex parte* seizure of imports at Customs and a procedure for testing goods prior to entry, both without provision for the Trade Commission's normal enforcement procedure of adversary cease-and-desist proceedings and judicial review. Because this procedure entirely dispensed with a hearing and because it varied so sharply from the Commission's customary mode of proceeding against possible wrongdoers, we structured our review to "look for some fairly strong indication, backed by sound policy, that Congress meant for the Commission to act in this way."

24. Address by FTC Chairman Paul Rand Dixon, American Association of Advertising Agencies, April 28, 1962, quoted in Auerbach, The Federal Trade Commission: Internal Organization and Procedure, 48 Minn.L.Rev. 383, 456 (1964); Shapiro, *supra* note 10, 78 Harv.L.Rev. at 962.

25. *See* Report of the ABA Commission to Study the Federal Trade Commission 11 (1969); Elman, Rulemaking Procedures in the FTC's Enforcement of the Merger Law, 78 Harv.L.Rev. 385 (1964).

133 U.S.App.D.C. at 356, 410 F.2d at 1055. *See also* FMC v. Anglo-Canadian Shipping Co., 9 Cir., 335 F.2d 255, 258–259 (1964) (involving agency use of pre-hearing discovery procedures).

█ Unlike either *Textile & Apparel Group* or *Anglo-Canadian Shipping Co.,* this case does not involve nearly so drastic a departure from accustomed modes of agency proceeding. The rule here does not bypass the Commission's statute-based cease-and-desist proceedings. It merely supplements them. Moreover, in light of the concern evident in the legislative history that the Commission give attention to the special circumstances of individual businesses in proceeding against them, *see* Appendix at pages 704–705, the Commission should administer any rules it might promulgate in much the same way that courts have ordinarily required other agencies to administer rules that operate to modify a regulated party's rights to a full hearing. That is, some opportunity must be given for a defendant in a Section 5 proceeding to demonstrate that the special circumstances of his case warrant waiving the rule's applicability, as where the rationale of the rule does not appear to apply to his own situation or a compelling case of hardship can be made out. *See* FPC v. Texaco, Inc., *supra,* 377 U.S. at 40, 84 S.Ct. 1105; United States v. Storer Broadcasting Co., *supra,* 351 U.S. at 205, 76 S.Ct. 763; Gulf Oil Corp. v. Hickel, 140 U.S.App.D.C. 368, 375, 435 F.2d 440, 447 (1970); WAIT Radio v. FCC, 135 U.S.App.D.C. 317, 321, 418 F.2d 1153, 1157 (1969); Sun Oil Co. v. FPC, 5 Cir., 355 F.2d 181, 183 (1965). *See generally* Sofaer, Judicial Control of Informal Discretionary Adjudication and Enforcement, 72 Colum.L.Rev. 1293, 1329–1330 (1972); Note, The Use of Agency Rulemaking to Deny Adjudications Apparently Required by Statute, 54 Iowa L.Rev. 1086, 1104–1105, 1115–1119 (1969).

█ Moreover, as we have pointed out, substantive rule-making is a widely utilized practice throughout our administrative agencies, and its use has been upheld even in cases where its use appears to conflict with regulated parties' adjudicatory rights, as in *Storer, Texaco, Inc.,* and their successors. In dealing with this apparent conflict of private parties' adjudicatory rights and the agencies' interests in promulgating clear policy guidelines to provide notice to an industry and to avoid time-consuming individualized hearings on issues that are common in that industry, courts have stressed the advantages of efficiency and expedition which inhere in reliance on rule-making instead of adjudication alone. *See* FPC v. Texaco, Inc., *supra,* 377 U.S. at 44, 84 S.Ct. 1105; American Airlines, Inc. v. CAB, *supra,* 123 U.S. App.D.C. at 315, 359 F.2d at 629; *see also* Weinberger v. Bentex Pharmaceuticals, Inc., *supra,* 412 U.S. at 649–654, 93 S.Ct. 2488; Weinberger v. Hynson, Westcott & Dunning, Inc., *supra,* 412 U.S. at 619–628, 93 S.Ct. 2469. Furthermore, under the Administrative Procedure Act the public, including all parties in the industry who might be affected, are given a significant opportunity prior to promulgation of a rule to ventilate the policy and empirical issues at stake through written submissions, at a minimum, *see* 5 U.S.C. § 553, or more, as here, where the agency permitted oral argument in a nonadjudicatory setting. Finally, any rules promulgated by the agency are subject to judicial review testing their legality and ensuring that they are within the scope of the broad statutory prohibition they purport to define.

█ Any fears that the agency could successfully use rule-making power as a means of oppressive or unreasonable regulation seem exaggerated in view of courts' general practice in reviewing rules to scrutinize their statement of basis and purpose to see whether the major issues of policy pro and con raised in the submissions to the agency were given sufficient consideration. Automotive Parts & Accessories Assn v. Boyd, 132 U.S.App.D.C. 200, 208–213, 407 F.2d 330, 338–343 (1968). *See also* City of Chicago, Ill. v. FPC, 147 U.S.App.D.C. 312, 322–326, 458 F.2d 731, 741–745

(1971), cert. denied, 405 U.S. 1074, 92 S.Ct. 1495, 31 L.Ed.2d 808 (1972). The Commission is hardly free to write its own law of consumer protection and antitrust since the statutory standard which the rules may define with greater particularity is a legal standard. Although the Commission's conclusions as to the standard's reach are ordinarily shown deference, see FTC v. Motion Picture Advertising Service Co., supra, 344 U.S. at 396, 73 S.Ct. 361; FTC v. Cement Institute, supra, 333 U.S. at 720–721, 68 S.Ct. 793; FTC v. R. F. Keppel & Bro., Inc., 291 U.S. 304, 314, 54 S.Ct. 423, 78 L.Ed. 814 (1934), the standard must "get [its] final meaning from judicial construction." FTC v. Colgate-Palmolive Co., 380 U.S. 374, 385, 85 S.Ct. 1035, 1043, 13 L.Ed.2d 904 (1965). See also FTC v. Cement Institute, supra, 333 U. S. at 709, 68 S.Ct. 793; Atlantic Refining Co. v. FTC, 381 U.S. 357, 368, 85 S. Ct. 1498, 14 L.Ed.2d 443 (1965).

As we suggested earlier, our task in determining the meaning of this legislation is the usual one of "starting from the areas where the legislative intent is readily discernible, and projecting to fair and reasonable corollaries of that intent for the specific issue before us." Montana Power Co. v. FPC, 144 U.S.

App.D.C. 263, 270, 445 F.2d 739, 746 (1970) (en banc), cert. denied, 400 U.S. 1013, 91 S.Ct. 566, 27 L.Ed.2d 627 (1971). Under this approach, we start here with the language of Section 6(g). It is as clear as it is unlimited: "The Commission shall also have power * * * to make rules and regulations for the purpose of carrying out the provisions of [Section 5]." Ambiguous legislative history cannot change the express legislative intent. The Commission is using rule-making to carry out what the Congress agreed was among its central purposes: expedited administrative enforcement of the national policy against monopolies and unfair business practices. Under the circumstances, since Section 6(g) plainly authorizes rule-making and nothing in the statute or in its legislative history precludes its use for this purpose, the action of the Commission must be upheld.

## VI

■■ Our conclusion as to the scope of Section 6(g) is not disturbed by the fact that the agency itself did not assert the power to promulgate substantive rules until 1962 [26] and indeed indicated intermittently before that time that it lacked such power.[27] As the Su-

26. See note 29 infra.

27. See 1922 FTC Annual Report 36; Hearings on H.R. 2321 Before the House Committee on Interstate & Foreign Commerce, 82d Cong., 1st Sess., 160 (1951) (statement of Mr. Henry Miller, Assistant General Counsel, FTC); Kintner, The Current Ordeal of the Administrative Process: In Reply to Mr. Hector, 69 Yale L.J. 965, 970–971 (1960) (the author was the current chairman of the FTC). See generally 117 Cong.Rec. S 17877–17879 (daily ed. Nov. 8, 1971). During its early years, the Commission relied heavily on trade practice conferences in which members of certain industries would convene and agree on guidelines defining fair trade practices and would attempt to comply with them. But these agreements had merely advisory status for purposes of determining what practices the agency would move against. FTC, Trade Practice Submittals 22 (1925). One attempt was made, by Sen. Nye of S. Dak., to give these rules the

force of law, as substantive rules are said to have today, see S. 2628, 72d Cong., 1st Sess. (1932), 75 Cong.Rec. (Part 2) 1287 (1932), but no action was taken in Congress on his bill. In some cases, moreover, the Supreme Court has referred to the Commission's method of elaborating the statutory standard as a "'gradual process of judicial inclusion and exclusion,'" see FTC v. Raladam Co., 283 U.S. 643, 648, 51 S.Ct. 587, 590, 75 L.Ed. 1324 (1931), quoting Davidson v. New Orleans, 96 U.S. (6 Otto) 97, 104, 24 L.Ed. 616 (1878). See also Pan American World Airways v. United States, 371 U.S. 296, 307–308, 83 S.Ct. 476, 9 L.Ed.2d 325 (1963); Schechter Poultry Corp. v. United States, 295 U.S. 495, 533, 55 S.Ct. 837, 79 L.Ed. 1570 (1935); FTC v. Gratz, 253 U.S. 421, 435–437, 40 S.Ct. 572, 64 L.Ed. 993 (1920). But these isolated quotes are hardly determinative, since the Court has never faced the precise question of whether the Commission was

preme Court put it in United States v. Morton Salt Co., *supra,* a case which involved what was thought to be a novel assertion of the FTC's statutory authority:

"The fact that powers long have been unexercised well may call for close scrutiny as to whether they exist; but if granted, they are not lost by being allowed to lie dormant, any more than nonexistent powers can be prescripted by an unchallenged exercise. We know that unquestioned powers are sometimes unexercised from lack of funds, motives of expediency, or the competition of more immediately important concerns. We find no basis for holding that any power ever granted to the Trade Commission has been forfeited by nonuser [*sic*]."

338 U.S. at 647–648, 70 S.Ct. at 366. *See also* FTC v. Dean Foods Co., *supra,* 384 U.S. at 610, 86 S.Ct. 1738; United States v. E. I. duPont & Co., 353 U.S. 586, 590, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957). The various statements made by Commission representatives questioning its authority to promulgate rules which are to be used with binding effect on subsequent adjudications are not determinative of the question before us. True, the accustomed judicial practice is to give "great weight" to an agency's construction of its own enabling legislation, particularly when such a construction stretches back, as here, to a time close to the agency's origin.[28] *See* Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); United States v.

American Trucking Assns, 310 U.S. 534, 549, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940); Norwegian Nitrogen Products Co. v. United States, 288 U.S. 294, 315, 53 S.Ct. 84, 77 L.Ed. 512 (1933). The argument for judicial deference is not so strong where, as here, the question does not require special agency competence or expertise, requiring the agency, for example, to make a complex judgment involving its areas of expertise, competition and impact of business practices on consumer behavior. Here, the question is simply one of statutory interpretation concerning the procedures and setting in which the Commission may elaborate its statutory standard. Since this sort of question calls largely for the exercise of historical analysis and logical and analogical reasoning, it is the everyday staple of judges as well as agencies. Thus we feel confident in making our own judgment as to the proper construction of Section 6(g). *See* Wilderness Society v. Morton, 156 U.S.App.D.C. 121, 145, 479 F.2d 842, 866 (1973) (*en banc*), cert. denied, 411 U.S. 917, 93 S.Ct. 1550, 36 L.Ed.2d 309, (1973); Thompson v. Clifford, 132 U.S.App.D.C. 351, 364, 408 F.2d 154, 167 (1968). We are, of course, reassured by the fact that the Commission itself, as distinguished from its former spokesmen, has come to the same conclusion.

Our refusal to abdicate our "ultimate responsibility to construe the language employed by Congress," Zuber v. Allen, 396 U.S. 168, 193, 90 S.Ct. 314, 328, 24 L.Ed.2d 345 (1969), is further supported by the fact that the Commission's

---

delegated substantive rule-making power by Congress and the various comments can be best understood as descriptive of the Commission's then existent mode of operation rather than as prescriptive of the lawful bounds of the agency's powers. To give weight to these quotes would force us to weigh them against the unelaborated assertion by Mr. Justice Goldberg in his dissenting opinion in Atlantic Refining Co. v. FTC, 381 U.S. 357, 390–391, 85 S.Ct. 1498, 1517, 14 L.Ed.2d 443 (1965), that "[t]he Commission has the general power to choose to proceed in this field, as in others, through either rule-making or

the process of case-by-case adjudication. * * * Whichever method the Commission chooses to use, however, it seems obvious to me that the Commission must formulate a clear rational rule which is based on an adequate economic explication and takes into consideration the situation of all industry members affected by the rule." In our view, to repeat, it seems safe to conclude that no decision of the Supreme Court concerning the agency foreshadows today's result either way.

28. *See* 1922 FTC Annual Report, *supra* note 27, at 36.

present claim of substantive rule-making authority is not new, but of several years' standing,[29] and, more important, by our belief that rejecting the claim of rule-making power would run counter to the broad policies of expeditious enforcement and greater certainty in the administration of the statute that clearly motivated Congress in 1914. *Cf. ibid.* So far as we can tell, the earlier assertions of lack of rule-making power were based on an unduly crabbed and cautious analysis of the legislative background, an analysis that we have conducted independently and that has brought us to an opposite but, in our judgment, correct conclusion.

A more troubling obstacle to the Commission's position here is the argument that Congress was made fully aware of the formerly restrictive view of the Commission's power and passed a series of laws granting limited substantive rule-making authority to the Commission in discrete areas allegedly on the premise that the 1914 debate withheld such authority. Where there has been evidence of congressional knowledge of and acquiescence in a long-standing agency construction of its own powers, courts have occasionally concluded that the agency construction had received a *de facto* ratification by Congress. *See* Power Reactor Development Co. v. Int. Union of Elec., Radio & Machine Wkrs,

367 U.S. 396, 409, 81 S.Ct. 1529, 6 L. Ed.2d 924 (1961); *cf*. Boesche v. Udall, 373 U.S. 472, 482–483, 83 S.Ct. 1373, 10 L.Ed.2d 491 (1963).

But *de facto* ratification through acquiescence in an administrative construction is not lightly attributed. *See* Zuber v. Allen, *supra*, 396 U.S. at 193, 90 S.Ct. 314; Power Reactor Development Co. v. Int. Union of Elec., Radio & Machine Wkrs, *supra*; Ex parte Endo, 323 U.S. 283, 303 n. 24, 65 S.Ct. 208, 89 L.Ed. 243 (1944). The argument before us is not that Congress, by a combination of its knowledge of the agency construction and its inaction, as in *Power Reactor*, could be said to have accepted the construction. Even in these cases it can be argued quite plausibly that imputing ratification in this fashion fails to take into account significant practical aspects of the legislative process: those legislators actually aware of the construction in question may not have been so concerned as to raise it to the attention of most members,[30] and even in the event some legislators were deeply troubled by the construction, the press of other business was such as to keep the question on the "back burner."[31] Here the situation is different. The view that the Commission lacked substantive rule-making power has been clearly brought to the attention of Congress[32] and, rather than simply failing to act on

29. The Commission first announced it would enforce the prohibitions of § 5 with the assistance of substantive rules in 1962 when it amended its Rules of Practice to provide for issuance of Trade Regulation Rules, 27 Fed.Reg. 4636, 4796 (1962). But the actual effect of these rules and the Commission's view of whether they were merely to be viewed as interpretive or statutorily based and thus determinative of the questions to be litigated in § 5 proceedings remained unclear. *See* Statement of Basis and Purpose of Trade Regulation Rule [Cigarette Advertising], 29 Fed.Reg. 8325, 8369 n. 143 (1964). The chairman of the FTC, Mr. Paul Rand Dixon, indicated after 1962 that the kind of binding rule-making authority the FTC asserts here did not exist. *See, e. g.,* Hearings on H.R. 15440 Before House Interstate & Foreign Commerce Committee, 89th Cong., 2d Sess., 990 (1966);

Hearings on S. 387 Before Senate Subcommittee on Antitrust & Monopoly of the Committee on the Judiciary, 88th Cong., 1st Sess., 281–282 (1963). *See generally* Case Note, *supra* note 23, 14 B.C.Ind. & Comm.L.Rev. at 376–382.

30. *See* Zuber v. Allen, 396 U.S. 168, 193, 90 S.Ct. 314, 24 L.Ed.2d 345 (1969); Thompson v. Clifford, 132 U.S.App.D.C. 351, 361, 408 F.2d 154, 164 (1968).

31. *See* Jaffe, An Essay on Delegation of Legislative Power: I, 47 Colum.L.Rev. 359, 366 (1947).

32. *See, e. g.,* Hearings on H.R. 2321, *supra*, note 27, at 160–161; Hearings on H.R. 15440, *supra* note 29, at 990. *See also* H.R.Rep. No. 986, 85th Cong., 1st Sess., 2 & n. 1 (1957) (discussing the predecessor of the Textile Fiber Products Identification Act of 1958).

the question, Congress, in expanding the agency's powers in several discrete areas of marketing regulation, affirmatively enacted limited grants of substantive rule-making authority in the Wool Products Act of 1939,[33] the Fur Products Labeling Act of 1951,[34] the Flammable Fabrics Act of 1953 as amended in 1967,[35] the Textile Fiber Products Identification Act of 1958,[36] and the Fair Packaging and Labeling Act of 1967.[37] Thus it is argued that Congress would not have granted the agency such powers unless it had felt that otherwise the agency lacked rule-making authority.

■ Conceding the greater force of this argument than one premised on congressional inaction, we believe it must not be accepted blindly. In such circumstances, it is equally possible that Congress granted the power out of uncertainty, understandable caution, and a desire to avoid litigation. While this argument, like any theory requiring us to draw inferences from congressional action or inaction, may be speculative, we believe it cannot be ignored here. For there is ample evidence that, while some

of the limited rule-making legislation may well have been influenced by the belief that the 1914 Act did not grant the Commission substantive rule-making power,[38] at least during the passage of the Packaging and Labeling Act of 1967, this assumption was not accepted and was thought by many congressmen to be an open question, despite the protestations of the Commission's chairman that the agency was powerless under the 1914 Act.[39] The report of the House Committee on Interstate and Foreign Commerce, while pointing out that the agency lacked *"specific* authority" (emphasis added) to issue regulations prescribing standards for package labeling, suggested that the question of the agency's general authority under Section 6(g) to do so was open. The report noted that the "authority of the Commission to issue trade regulation rules * * * has never been passed on in the courts." H.R. Rep. No. 2076, 89th Cong., 2d Sess., 22 (1966). The Senate Committee report did not touch on the issue directly, instead focusing on the question whether stronger procedural safeguards than were guaranteed by the Administrative

33. *See* 15 U.S.C. § 68a (1970). The FTC, in furtherance of its power to enforce § 2 of the Clayton Act, as amended by the Robinson-Patman Act of 1936, 15 U.S.C. § 13 (1970), is also empowered "after due investigation and hearing to all interested parties, [to] fix and establish quantity limits, and revise the same as it finds necessary, as to particular commodities or classes of commodities, where it finds that available purchasers in greater quantities are so few as to render differentials on account thereof unjustly discriminatory or promotive of monopoly in any line of commerce; and the foregoing shall then not be construed to permit differentials based on differences in quantities greater than those so fixed and established * *." 15 U.S.C. § 13(a). And it is argued that the existence of this narrow provision should be taken, by implication, to exclude any broader Commission rule-making authority, especially in the pricing field. F. Rowe, Price Discrimination Under the Robinson-Patman Act 123–124 (1964 Supp.). But, as we suggested in text, *see* pp. 675–676 *supra,* this sort of logic, resting on the maxim *expressio unius est exclusio alterius,* is unreliable.

34. *See* 15 U.S.C. §§ 69a(a)–(c), 69f(b) (1970).

35. 81 Stat. 571 (1967). 15 U.S.C. § 1194(c) (1970).

36. 15 U.S.C. § 70a(a), (b), (c) (1970).

37. 15 U.S.C. § 1456(b) (1970).

38. *See, e. g.,* 86 Cong.Rec. (Part 10) 11320 (1940), where Congressman Case, in discussing the Wool Products Labeling Act's provision for rule-making and the opposition to granting such power to the agency, said:

"The second argument * * * is that the evils of false labeling are being curbed and gradually cured by the Federal Trade Commission. If that were so the Federal Trade Commission itself would not be on record in favor of the passage of the bill and the Federal Trade Commission did testify in favor of the bill. It testified that something like this was needed to put teeth into their recommendations to the trade."

39. *See* Hearings on H.R. 15440, *supra* note 29, at 990 (statement of Chairman Dixon).

Procedure Act should be enacted in the standards-setting section. S. Rep. No. 1186, 89th *Cong.*, 2d Sess., 17 (1966). But the dissenting members argued that the bill's provision of rule-making authority was redundant and that the rule-making provision merely served to "make the [Commission's] authority apparent." *Id.* at 40. As we suggested earlier, imputing congressional ratification to a disputed administrative construction of its powers is, in the words of the Supreme Court, "shaky business," Power Reactor Development Co. v. Int. Union of Elec., Radio & Machine Wkrs, *supra*, 367 U.S. at 409, 81 S.Ct. 1529. Where there is solid reason, as there plainly is here, to believe that Congress, in fact, has not wholeheartedly accepted the agency's viewpoint and

instead enacted legislation out of caution and to eliminate the kind of disputes that invariably attend statutory ambiguity, we believe that relying on the *de facto* ratification argument is unwise. In such circumstances, we must perform our customary task of coming to an independent judgment as to the statute's meaning, confident that if Congress believes that its creature, the Commission, thus exercises too much power, it will repeal the grant.[40]

## VII

In sum, we must respectfully register our disagreement with the District Court's painstaking opinion. Its result would render the Commission ineffective to do the job assigned it by Congress. Such a result is not required

---

40. We are aware, of course, that in both the just concluded 92nd Congress and the current 93rd Congress legislation granting the FTC limited substantive rule-making power in the area of "unfair and deceptive practices" has been under consideration. One such bill, S. 986, 92d Cong., 1st Sess. (1971), was passed by the Senate, 117 Cong.Rec. S. 17887 (daily ed. Nov. 8, 1971), but did not come to a vote in the House. It is also true that in the Senate debate on S. 986 comments were made by various Senators to the effect that the Commission currently lacked the power to issue rules defining either unfair methods of competition or unfair or deceptive acts or practices, which rules would be enforceable in cease and desist proceedings. *See id.* at 17843–17848 (statement of Sen. Hruska) ; *id.* at 17849 (statement of Sen. Cook) ; *id.* at 17873 (statement of Sen. Cotton), but no such statement was made by the bill's sponsor, Sen. Magnuson, who pointed out, "For years the argument has been going on about the Federal Trade Commission not having the authority it should have. We tried to fashion a bill. I, myself, had some doubts about the rule-making authority, but I think the bill covers it very well." *Id.* at 17858. The bill that passed the Senate not only gave the FTC power "to issue legislative rules defining with specificity acts or practices which are unfair or deceptive to consumers and which section 5(a)(1) of this Act proscribes," S. 986, *supra*, § 206, but it also provided that procedures available in adjudication under the Administrative Procedure Act, 5 U.S.C. §§ 556, 557

(1970), should be employed and judicial review should employ the substantial evidence rule. *Ibid.* Moreover, such rules would only become effective in the event neither the House of Representatives nor the Senate disapproved them within 60 calendar days while in session. *Ibid.* If this legislation had actually been enacted, of course, the Commission would not have *all* the power it assumes today, since the proposed rule-making section in S. 986 repealed § 6(g), as passed in 1914, and substituted a provision allowing only rules and regulations "as are specifically provided for hereinafter," thus nullifying any argument that rules might be promulgated to define "unfair methods of competition." On the other hand, but for the statements on the Senate floor quoted above, it is possible to interpret S. 986 as an indication of senatorial intent to narrow what the legislators felt was presently an overbroad rule-making power under the current statute. In any event, the legislation did not pass, and we take its reintroduction in the current session in substantially similar form, S. 356, 93d Cong., 1st Sess. (1973), as an indication that the questions of FTC rule-making power, its scope, and the safeguards surrounding the promulgation of such rules, are under close study and nothing more. In the event Congress decides that the scope of rule-making power that we find to be implied in the 1914 Act is too broad or lacks sufficient safeguards, surely it appears in a prime position to make the required changes.

by the legislative history of the Act. We rely, therefore, on the plain language of Section 6(g) which gives the Commission the authority to "make rules and regulations for the purpose of carrying out the provisions of [Section 5]." *See* Mourning v. Family Publications Service, Inc., *supra*. We hold that under the terms of its governing statute, 15 U.S.C. § 41 *et seq.*, and under Section 6(g), 15 U.S.C. § 46(g), in particular, the Federal Trade Commission is authorized to promulgate rules defining the meaning of the statutory standards of the illegality the Commission is empowered to prevent. Thus we must reverse the District Court's judgment and remand this case for further proceedings.

It is so ordered.

## APPENDIX

### THE 1914 CONGRESSIONAL DEBATES INVOLVING TRADE COMMMISSION RULE-MAKING POWER

The result we reach in this case might be different if we were convinced that the legislators who worked out the details of the Federal Trade Commission Act had carefully focused on the implications of rule-making power and given a clear indication that they rejected its use except for purely procedural purposes. We have examined the legislative history—the debates and reports—with considerable care and have analyzed appellees' arguments based on that history. We find that on the question of rule-making the leading proponents of the legislation in both Houses spoke ambiguously. The scope of the Commission's power to make rules was not a central issue in the lengthy debate, and the occasional comments to which we are referred by appellees as demonstrating a firm contrary intent on the part of those most familiar with the details of

the legislation turn out, on close inspection, to be most sensibly interpreted in ways other than those urged on us.

I. *Consideration in the House of President Wilson's 1914 Proposal.*

Two days after President Wilson's 1914 message to Congress, the Administration's plan for a trade commission was introduced in both Houses of Congress. Sponsored by Congressman Clayton of Alabama and Senator Newlands, the bill [1] essentially provided for an investigatory commission, clothed with power to compel reports on corporations and business and financial practices and to recommend prosecution under the antitrust laws. The proposed agency lacked any independent power to order a halt to business practices involving a violation of law. The agency did have the power, upon the initiative of the Attorney General, to assist him in framing antitrust settlements and, upon the request of federal judges trying antitrust cases, to make findings involving questions in pending litigation as well as to assist in framing decrees. The Clayton-Newlands bill was modified somewhat in the House Committee on Interstate and Foreign Commerce. The bill reported out, drafted by Congressman Covington,[2] deleted the authority contained in the original proposal to allow the commission to recommend antitrust prosecutions, but otherwise was closely similar to the bill originally proposed. The Committee majority explicitly rejected "the establishment of a commission having powers of regulation or control of prices, or the power directly to issue orders controlling the lawful operations of industrial business in this country." [3]

The Covington bill did, however, include a section granting the commission authority to "make rules and regulations

---

1. H.R. 12120, S. 4160, 63d Cong., 2d Sess. (1914). *See* 51 Cong.Rec. (Part 3) 2142–2144 (1914).

2. H.R. 15613, 63d Cong., 2d Sess. (1914), reported out at 51 Cong.Rec. (Part 9) 8840 (1914).

3. H.R.Rep. No. 533, 63d Cong., 2d Sess., 2 (1914).

and classifications of corporations" in order to carry out the bill's other provisions, but it was agreed that this merely gave the commission power to elaborate in detail which businesses would be subject to its reporting requirements. *See* 51 Cong.Rec. (Part 9) 8842–8844 (1914) (statement of Congressman Covington); *id.* at 9047–9048 (statement of Congressman Towner of Iowa).[4]

Little that occurred in the House debate up to the passage on June 5 of the Covington bill, still formally backed by the President, bears directly on the issue before us. The proposed commission was given no power to approve or disapprove particular business practices according to a legal standard, and thus the question of utilizing substantive rulemaking in aid of adjudication was submerged under the broader question whether the commission should have any independent enforcement authority at all.

This is not to say that the House wholly ignored the question of independent enforcement authority for the commission. Five Republican members of the Committee, while accepting the Covington bill, noted pointedly that it did not follow the approach of the 1912 GOP platform, which had proposed having the commission assume some of the antitrust functions currently exercised by the courts, an undoubted reference to plans that the agency should have power to bring cases, hear evidence, make findings, and promulgate orders enforceable in federal courts. Representative Stevens of New Hampshire dissented from the majority on the Committee and be-

rated the Covington bill for failing to give the commission "general power to prevent unfair competitive practices" in order to correct what he saw as the "disappointing" results of relying wholly on Justice Department prosecutions in the federal courts, which he characterized as a "slow, costly process." [5] Stevens' own proposal to give the commission independent adjudicatory power, H.R. 15660, 63d Cong., 2d Sess. (1914), did not appear to contemplate use of substantive rules promulgated separately from the hearings he proposed to order corporations to halt practices constituting "unfair or oppressive competition." Instead, he viewed "unfair or oppressive competition" as a "question of fact to be decided by the commission the same way [on a case-by-case basis] that the Interstate Commerce Commission decides what rates and practices of the railroads are unreasonable and unfair." [6] When Stevens attempted to bring his bill to the floor, he was ruled out of order. 51 Cong.Rec. (Part 9) at 9062. An even stronger amendment introduced by Representative Murdock of Kansas not only gave the commission power to halt "unfair or oppressive competition," but also provided a list of practices defining the term and authorized the commission, in some circumstances, to assume price-fixing power to halt monopoly. *Id.* at 9050–9051. This proposal, too, was rejected. *Id.* at 9055.

The question whether the commission should have power to define rules of business conduct through nonadjudicatory proceedings also surfaced, but proposals to give the commission such power were rejected.[7] The debate on such

---

4. *See also* H.R.Rep. No. 533, *supra* note 3, at 3–4.

5. *Id.*, Part 2, at 1.

6. *Id.* at 2.

7. Congressman Morgan of Okla. proposed to amend the Covington bill to give the commission power to declare rules to prevent corporations subject to the commission's jurisdiction "from engaging in any practice or from using any method or system, or from pursuing any policy or from

resorting to any device, scheme, or contrivance that constitutes unfair competition or unjust discrimination as between competitors, individuals, or communities." 51 Cong.Rec. (Part 9) at 9047. This amendment was quickly rejected. *Id.* at 9050. A similar proposal was made by Cong. Dillon of S. Dak., *id.* at 9056, but his plan would have specifically granted the commission adjudicatory power too. *Ibid.* It was rejected. *Id.* at 9057. This proposal, in turn, was similar to one

plans was perfunctory, probably because it was clear that the majority of the House supported the concept of a weak commission without any enforcement or independent rule-making authority. At this early stage in the deliberations, it seemed to make little difference to the majority behind the Covington bill that some opponents, like Stevens, backed a commission with purely adjudicatory powers and others, principally Progressives like Murdock and Lafferty, preferred an agency relying on a combination of adjudication and substantive rule-making. Thus, while we occasionally give weight to positive rejections of amendments by Congress, see e.g., National Automatic Laundry & Cleaning Council v. Shultz, 143 U.S.App.D.C. 274, 291, 443 F.2d 689, 706 (1971), we believe we are justified here in concluding that the rejection of rule-making proposals did not necessarily represent a rejection of rule-making as a distinctive technique of agency regulation, but could just as easily, if not more persuasively, be interpreted as a broader rejection of a commission with any independent enforcement power. Cf. United States v. Wise, 370 U.S. 405, 411, 82 S.Ct. 1354, 8 L.Ed.2d 590 (1962).

For our purposes, it is enough to note that opponents of the President's initial plan who argued for a stronger commission agreed broadly that continued reliance on the courts for adjudication of cases involving anticompetitive practices was an inadequate solution. Representative Dillon of South Dakota, for example, proposed that a commission have power to make rules regulating "future conduct" and enforcement power to issue

orders against breaches of such rules as well as breaches of a broad standard of "any misconduct, unfair methods, unfair competition, acts of oppression, or acts of deception." 51 Cong.Rec. (Part 9) at 9056. His proposal would seem on its face to contemplate a commission utilizing rule-making to specify standards of improper conduct under a broad standard and then adjudication as a mode of enforcing such standards in cases where they applied. He went so far as to reject almost all further judicial participation in the task of restoring free competition, arguing in accustomed terms:

> "The attempt to control the corporations through the judiciary will fail. The judiciary with its delays, its technicalities, and uncertainties is wholly inadequate to regulate or control the trusts and combinations. The legislative department of government does not need the aid of the courts in regulating legislative or administrative matters. * * *"

*Ibid.*

II. *Consideration in the Senate of President Wilson's Revised Proposal.*

After the Covington bill passed the House, it went to the Senate Committee on Interstate Commerce whose chairman, Senator Newlands, had been an original sponsor of the President's trade commission plan. Within a few days of the House vote, however, the President radically altered his view as to the proper extent of the commission's powers. No longer did he support the Covington bill's conception of a commission without

---

made by Cong. Lafferty of Ore. in a report dissenting from the Commerce Committee's recommendation of the Covington bill. Lafferty's plan would have granted the commission adjudicatory *and* substantive rule-making authority to prevent "unfair or oppressive competition or unfair trade practices," and authority once a violation had been found, not only to issue a restraining order, but also, in the event of a finding of "substantial monopoly" and "exhorbitant prices," a limited price-fixing remedial power, as well as power to eliminate "substantial monopoly" by

an "order * * * specifying such changes in the organization, conduct, or management of its property * * * as * * * will most effectively and promptly terminate such monopolistic power, while at the same time safeguarding property rights and business efficiency." H.R. Rep. No. 533, *supra* note 3, Part 3, 19–26. The final amendment to add significant powers to the Covington bill's commission was made, again, by Cong. Morgan. It provided for adjudicatory and price-fixing powers, 51 Cong.Rec. (Part 9) at 9066, and was quickly rejected, *id.* at 9067.

independent enforcement power. In a turnabout, he now backed legislation *giving the agency power to order a halt to unfair competition practices after holding a hearing and making findings.*[8] Historians[9] are broadly agreed on the rationale for the President's switch of position. As part of his package of economic reform legislation, which included the plan for a weak trade commission, the President was supporting legislation to make more specific the antitrust laws' prohibitions. This latter bill was introduced by Congressman Clayton of Alabama and ultimately became the Clayton Act.[10] In its original form, the Clayton bill laid out a series of new prohibitions on anticompetitive behavior, provided for Justice Department enforcement of

the new rules, and provided criminal penalties for violations.[11] This bill passed the House on June 5, the same day as the Covington bill providing for a new trade commission.[12] But the Clayton bill received widespread criticism, not only from businessmen and their legislative backers who resented the provisions for criminal penalties, but also from those supporting tightening of the rules of antitrust. The reformers' argument was that the task of defining in statutory terms all possible restraints of trade injurious to competition was essentially Sisyphean, that businessmen were sufficiently clever to invent new forms of trade restraint that would escape the coverage of the Clayton bill's provisions.[13] The President was appar-

---

8. Wilson's change of mind is discussed in A. Link, Wilson: The New Freedom 434–438 (paper ed. 1965) ; R. Cushman, The Independent Regulatory Commissions 186–187 (1941) ; G. Henderson, The Federal Trade Commission: A Study in Administrative Law and Procedure 26–27 (1924).

9. *See* note 8 *supra.*

10. Act of Oct. 15, 1914, c. 323, 38 Stat. 730 *et seq.*, as amended, 15 U.S.C. §§ 12–27 (1970). As finally enacted, a few weeks after the Trade Commission Act was passed, the Clayton Act gave the FTC the power to enforce its substantive provisions aimed at price discrimination, § 2, as amended, 15 U.S.C. § 13, exclusive dealing and tying arrangements, § 3, 15 U.S.C. § 14, anticompetitive mergers, § 7, as amended, 15 U.S.C. § 18, and interlocking directorates, § 8, as amended, 15 U.S.C. § 19. The FTC's enforcement of these provisions would occur in adjudicatory proceedings reviewable in the Courts of Appeals, similar to the proceedings carried on under § 5 of the Trade Commission Act. *See* § 21 of the Clayton Act, as amended, 15 U.S.C. § 21.

11. H.R. 15657, 63d Cong., 2d Sess. (1914).

12. *See* 51 Cong.Rec. (Part 10) 9910–9911 (1914).

13. *See* sources cited in note 8 *supra.* The Senate Committee on Interstate Commerce report endorsing the new version of the commission bill made this point explicitly:

"One of the most important provisions of the bill is that which declares unfair competition in commerce to be unlawful, and empowers the commission to prevent corporations from using unfair methods of competition in commerce by orders issued after hearing, restraining, and prohibiting unfair methods of competition, which orders are enforceable in the courts.

"The committee gave careful consideration to the question as to whether it would attempt to define the many and variable unfair practices which prevail in commerce and to forbid their continuance or whether it would, by a general declaration condemning unfair practices, leave it to the commission to determine what practices were unfair. It concluded that the latter course would be the better, for the reason, as stated by one of the representatives of the Illinois Manufacturers' Association, that there were too many unfair practices to define, and after writing 20 of them into the law it would be quite possible to invent others.

"It may be stated that representatives of the National Implement and Vehicle Manufacturers' Association, the Ohio Manufacturers' Association, and the Illinois Manufacturers' Association approved the passage of a trade commission bill and a provision regarding the inquiry into and condemnation of unfair practices in trade.

"It is believed that the term 'unfair competition' has a legal significance which can be enforced by the commis-

ently receptive to this criticism of the Clayton bill. Moreover, he was also apparently receptive to criticism of the traditional practice of relying exclusively on the Justice Department and the courts for antitrust enforcement. Thus he dealt with these two types of criticism by radically changing and expanding the role he had originally planned for the commission. Now it would be given independent authority to enforce through adjudicatory proceedings a broad standard of illegality that, unlike the specific terms of the Clayton bill, could be adapted to the variety of business practices with anticompetitive effects.[14]

The leadership of the Senate Commerce Committee was informed of the President's change of heart and promptly pushed through the Committee onto the floor legislation embodying the new plan. But the bill reported out clearly did not embrace the exercise of substantive rule-making power. The bill that passed the House had a separate section

giving the commission power to make rules and regulations to define the scope of its investigatory authority.[15] But the new bill reported out of the Commerce Committee by Senator Newlands which gave the commission, at the behest of the President, new enforcement authority contained no grant of any rule-making power.[16] What the Committee apparently had in mind was a *quasi*-judicial agency, elaborating the Committee bill's statutory standard of illegality— "unfair competition"—on a purely case-by-case basis. This view of the bill that emerged on the Senate floor after the Administration decided to support a commission with expanded power is amply supported by statements by the bill's proponents on the Senate floor, *see* 51 Cong.Rec. (Part 11) 11178 (1914) (statement of Senator Hollis); 51 Cong.Rec. (Part 13) 12916–12917 (1914) (statement of Senator Cummins); 51 Cong.Rec. (Part 13) at 13317 (statement of Senator Walsh), as well as statements by critics of the bill, *see* 51 Cong.Rec.

sion and the courts, and that it is no more difficult to determine what is unfair competition than it is to determine what is a reasonable rate or what is an unjust discrimination. The committee was of the opinion that it would be better to put in a general provision condemning unfair competition than to attempt to define the numerous unfair practices, such as local price cutting, interlocking directorates, and holding companies intended to restrain substantial competition."

S.Rep. No. 597, 63d Cong., 2d Sess., 13 (1914). *See also* 51 Cong.Rec. (Part 11) 11084 (1914) (statement of Senator Newlands, chairman of the Commerce Committee).

14. *See* A. Link, *op. cit. supra* note 8, at 435–439.

15. *See* H.R. 15613, *supra* note 2, § 8. The House-passed bill is printed at H.R. Rep. No. 1142, 63d Cong., 2d Sess., 10–13 (1914).

16. There may be reason to believe that this deletion of rule-making authority in the Senate bill was merely a linguistic alteration of the Covington bill. The Covington bill's rule-making power was meant to permit the commission to designate which corporations with gross receipts of

less than $5 million would be required to file annual reports. 51 Cong.Rec. (Part 9) at 8845–8846. There was some dispute over whether this power extended to allow the commission to impose on corporations subject to its reporting requirements a uniform system of accounting and an amendment was offered by Cong. Towner of Iowa to grant the commission this power explicitly, *id.* at 9047, but it was quickly rejected, *id.* at 9049. The bill that emerged from the Senate Commerce Committee, *see* S. 4160, § 3(c), printed at S.Rep. No. 597, *supra* note 13, at 1–5, appeared to give the commission discretionary power, without terming this power rule-making authority, to require corporate reports from any firm as well as the power to require a uniform system of annual reports, which might be viewed as tantamount to a uniform accounting requirement. And this provision was unchanged in the bill that passed the Senate. *See* H.R.Rep. No. 1142, *supra* note 15, at 15. Thus it would seem that the discretion given the commission in the House bill in the exercise of its power to compel corporate reporting remained in the Senate bill, but was simply phrased differently and no longer termed the power to "make rules and regulations and classifications of corporations."

(Part 11) at 11181 (statement of Senator Thomas). *See also* S. Rep. No. 597, 63d Cong., 2d Sess., 13 (1914).

In other words, we believe the Commission's position can draw no support from the Senate's deliberations over the bill granting the Commission enforcement power that emerged from the Senate Commerce Committee following President Wilson's change of heart. The bill that emerged from the Committee contained no provision even remotely supporting the exercise of commission rule-making power to define the statutory standard of illegality contained in the section of the bill granting the agen-

cy adjudicatory authority. Moreover, during the debate over the Commerce Committee's bill Senator Newlands, Committee chairman and the bill's floor manager, argued that the legislation before the Senate encompassed "no powers except those conferred by this bill," 51 Cong.Rec. (Part 12) at 11602, further supporting our view of this aspect of the deliberations. To be sure, the bill that emerged from the Senate Commerce Committee was amended in a few respects on the Senate floor prior to passage and submission to a House-Senate conference committee. But none of these amendments can be read as supporting rule-making power.[17]

17. The Senate did accept an important substitute proposed by Senator Cummins, 51 Cong.Rec. (Part 13) at 13109, for the version of § 5 reported out of the Senate Committee on Interstate Commerce. This substitute, printed at 51 Cong.Rec. (Part 13) at 13045, gave defendants found liable in commission proceedings the explicit right to bring suit in the District Courts for review of the commission's orders. No such provision was contained in the bill reported by the Senate Committee. *See* S. 4160, 63d Cong., 2d Sess., § 5 (1914), printed in S.Rep. No. 597, 63d Cong., 2d Sess., 3–4 (1914). Moreover, the Cummins substitute also made clear that the District Courts would apply the same standard of review to commission orders as was applied to orders of the Interstate Commerce Commission, at least in cases of review sought by defendants before the agency. The bill reported from the Commerce Committee did not make clear what standard of review the courts would apply to the commission's orders. It merely stated: "Whenever the commission, after the issuance of such order, shall find that such corporation has not complied therewith, the commission may petition the district court of the United States, within any district where the method in question was used or where such corporation is located or carries on business, praying the court to issue an injunction to enforce such order of the commission; and the court is hereby authorized to issue such injunction." *See* S.Rep. No. 597, *supra*, at 4. Because this provision suggested no actual standard of review, it was criticized by Senator Cummins on the ground that it might be construed so as to preclude any review of the commission's actions and to require the courts to

issue rubber-stamp injunctions. As such, it was felt, the bill might be held unconstitutional for want of due process. *See* 51 Cong.Rec. (Part 13) at 13007; *id.* at 13049–13050. *See also id.* at 13053 (statement of Senator Walsh). Cummins' substitute also made a slight linguistic change in the first few sentences of § 5, sentences enunciating the commission's enforcement power. The Committee's bill said:

"Sec. 5. That unfair competition in commerce is hereby declared unlawful.

"The commission is hereby empowered and directed to prevent corporations from using unfair methods of competition in commerce."

S.Rep. No. 597, *supra* note 13, at 3. The remainder of the section detailed the procedures by which the commission would act to prevent unfair competition and provided for judicial enforcement, as discussed above. In addition to altering the judicial review procedures, the first two sentences in his substitute revised the Committee's version slightly to read:

"Sec. 5. That unfair competition in commerce is hereby declared unlawful.

"The commission shall have authority to prevent such unfair competition in commerce *in the manner following, to wit: * * *"

51 Cong.Rec. (Part 13) at 13045. (Emphasis added.) It is tempting, of course, to conclude that the addition of the italicized language in the substitute demonstrates a senatorial purpose to make clear, by the use of arguably limiting language, that only through adjudication would the standard of illegality be clarified to cover specific business practices. But this language was not discussed on the floor and it really adds nothing to our

III. *The Conference Committee Deliberations and Final Floor Debates.*

Because the Senate bill lacked any rule-making provision and the House bill did not give the commission power to enforce a statutory standard of legality, the most important aspect of the legislative debate for our purposes occurred after the conference committee met and composed the differences between the two bills. It was only at this point that a rule-making provision was inserted which might justify the promulgation of rules defining the kinds of practices that breached the bill's standard of illegality. As we have pointed out, the House bill included a rule-making provision, but granted the commission no power to enforce a standard of legality. The Senate bill, by contrast, had no rule-making provision, but did include a standard of legality to be enforced by the commission. The conference bill put both types of provisions together in a single bill. We believe the rule-making provision, Section 6(g), justifies promulgation of standards defining with specificity the meaning of the statutory standard of legality in Section 5, a standard enforceable in subsequent agency adjudications.

Appellees insist that, since neither bill prior to conference granted the commission power to issue rules defining the statutory standard of illegality, the conference committee was barred by rules of congressional procedure from inserting this supplemental power. The leader of the House conferees, Congressman Covington, told the House that the bill produced by the conference was "within the limits of conference." 51 Cong.Rec. (Part 15) 14925 (1914). Senator Newlands, his Senate counterpart, pointed out, likewise, that the conference product was "entirely within the range of

difference between the Senate and the House." *Id.* at 14769. Thus we have the leaders of the House and Senate conferees assuring the Congress that the conference bill complied with conference limitations and the Congress accepting that assurance. More important, the assurance given the Congress by Covington and Newlands appears well founded. The original House bill contained a rule-making provision granting authority roughly commensurate with the powers of investigations the commission was then designed to have. While the Senate bill deleted any such authority, we believe it can be persuasively argued that by reinserting a rule-making provision into the stronger commission bill all the conference did was reinstate the principle of the House bill as to rule-making—that is, permitting the commission to exercise authority roughly commensurate with its other powers, great or small. In this sense, the insertion of Section 6(g), as interpreted here, does no violence to the principle limiting the authority of the conference. Moreover, while this general principle of germaneness as to the powers of a conference may bind Congress, it has never bound the courts, which have frequently faced the problem of interpreting legislation in light of conference changes. *Cf.* St. Regis Paper Co. v. United States, 368 U.S. 208, 221–222, 82 S.Ct. 289, 7 L.Ed. 2d 240 (1961).

Unfortunately, the crucial debates and reports on the bill produced by the conference, passed by both Houses, signed into law by the President, and continuing as the agency's basic organic statute today do not illuminate the meaning of Section 6(g). The House conference committee report does not mention the provision. *See* H.R. Rep. No. 1142, 63d Cong., 2d Sess. (1914). It is true, as appellees suggest, that the statement of

---

pre-existent view of the Senate deliberations on the bill that emerged from the Commerce Committee, since no provision granting rule-making power was inserted to start with. Of course, had this language stayed in the legislation as it was

ultimately passed by both Houses and signed by the President, we would have to deal with its implications. But it was removed in the conference committee, again without any discussion.

the House managers in the conference report contains some remarks that might be interpreted to limit the commission to adjudication in working out the meaning and applicability of the statutory standard. But we do not read their comments involving application of the Section 5 prohibition against unfair competition to "particular business situations" or their comment that the unfairness of any particular practice "generally depends upon the surrounding circumstances of the particular case" as necessarily foreclosing the use of rule-making to confine issues to be adjudicated and to give specificity to the standard of illegality. *Id.* at 19.

In our judgment, such comments should be interpreted in light of the managers' argument that, in framing a broad standard of unfairness rather than making an item-by-item listing of impermissible practices, the conference felt that such detailed legislative definitions would not "fit business of every sort in every part of this country." *Ibid.* To us, this means that Congress, at the time, felt that different practices in different industries or even similar practices in different industries would often warrant varying treatment by the commission. This is hardly tantamount to saying that practices of individual firms within the same industry necessarily warrant distinctive, individualized treatment, as appellees would have it. To say this, of course, is to suggest by implication that individual adjudications warrant only minimal precedential value and there is ample reason to believe that the legislators felt otherwise. As the bill's leading proponent, Senator Newlands, said: "We will build up through this commission a system of administrative law that will be as well and thoroughly accepted as to trade as are the decisions of our Interstate Commerce Commission regarding transportation, and we will bring peace and security to the business world." 51 Cong.Rec. (Part 11) at 11086.

In our view, the House managers' comments do not foreclose promulgation of substantive rules applicable to practices in a sector of an industry, throughout an industry, or in several industries at large. Rather, they suggest that the commission should administer any rules it might promulgate in much the same way that courts have ordinarily required other agencies to administer rules that operate to modify a regulated party's rights to a full hearing involving application of a statutory standard broader than the rule to his own particular circumstances. That is, some opportunity must be given for a defendant in a Section 5 proceeding to demonstrate that the special circumstances of his case warrant waiving the rule's applicability, as where the rationale of the rule does not appear to apply to his own situation or a compelling case of hardship can be made out. *See* text of the opinion at pages 691–692 *supra* and cases and materials cited therein. So long as the FTC makes available a "safety valve procedure" of this sort, in other words, we cannot see any conflict between the use of substantive rule-making and the concerns evidenced in the House managers' conference report that the commission should not treat varying business practices or defendants in a fashion that fails to appreciate relevant distinctions among them. This question of when waiver is appropriate or what procedures for waiver are required is not here before us. We have only the question of rule-making power *vel non* under the 1914 Act, but we do not believe the House managers' statements preclude the Commission's power to grant waivers of substantive rules under particularized circumstances.

The comparative print prepared by Senator Newlands to illustrate the differences and changes among the three bills—one passed in the House, one in the Senate, and one produced by the conference—is also cryptic on the rule-making question, but assuredly it does not support appellees' arguments. Indeed, it undercuts them seriously. First, the print suggests that the conference bill deleted the rule-making authority grant-

ed in Section 8 of the House bill which, as we have seen, pertained to the characteristics of corporations that would be required to submit reports to the commission. S.Doc., Comparative Print, 63d Cong., 2d Sess., 15 (1914). This suggests that Section 6(g) was entirely new and thus can be assumed to have a different, broader scope than the House bill's provision, particularly since there is no cross reference from Section 6(g) to the authority granted in the House bill. *Id.* at 12. Support for giving Section 6(g) a broad reading may also be derived from the committee's deletion of the "to wit" language in Section 5 in the sentence immediately preceding specification of the hearing, findings, and cease and desist procedure. Since "to wit" came before the procedures spelled out and at the end of a sentence mandating the commission to prevent "unfair competition" in the Senate bill, it can be argued that, by deleting the phrase, the conferees meant that the task of elaborating the statutory standard might be accomplished by means other than adjudication alone.

But it would be a mistake to press these inferences too far. They show only that evidence of clear congressional rejection or approval of substantive rule-making is scanty on both sides and not compelling. The same conclusion applies to the paucity of comments arguably pertaining to the scope of the agency's rule-making power that occurred in the debates in both Houses prior to final passage. As we read the legislative record, including the comments cited to us by both parties, it seems clear to us that the question of promulgating rules to elaborate the statutory standard and then relying on them in subsequent ad-

judications was a practice that simply failed to preoccupy those engaging in the post-conference debates. The Senate debates were brief, largely focusing on the question whether the conference committee had made any serious changes in the Senate-passed bill. The floor managers, perhaps seeking to speed passage, argued that only two changes of any moment were made: first, altering the statutory standard from "unfair competition" to "unfair methods of competition," which was said by Senator Cummins of Iowa, a leading proponent of the bill and a member of the conference, to make no difference in the scope of the commission's authority; and second, expanding the scope of judicial review of agency orders from that contemplated in the Senate bill. 51 Cong.Rec. (Part 15) at 14768. While such comments would obviously cut against the Commission's claim here, it is clear that the Senators did not entirely agree on this limited characterization of the conference's work. Indeed, Senator Thomas of Colorado argued that it "in many respects is an entirely new bill." *Ibid.* And one early commentator, a lawyer for the National Association of Manufacturers, suggested that Section 6(g) might well be viewed as a mandate for broad rule-making authority, commenting that while he felt the commission lacked power to "draft a code" of business behavior, there was a "prevalent notion to the contrary." J. Emery, A Handbook of the Federal Trade Commission Act (pamphlet, 1915, on file at FTC).

The District Court's opinion and appellees place considerable reliance on a series of comments made on the House floor during the final debate.[18] But we have examined these remarks carefully

18. As do those commentators who have concluded that the Act's legislative history does not support an assertion of legislative type rule-making power. *See* Weston, Deceptive Advertising and the Federal Trade Commission: Decline of Caveat Emptor, 24 Fed.B.J. 548, 570 (1964); Shapiro, The Choice of Rulemaking or Adjudication in the Development of Administrative Policy, 78 Harv.L.Rev. 921,

960 (1965); Burrus & Teter, Antitrust: Rulemaking v. Adjudication in the FTC, 54 Geo.L.J. 1106, 1125 (1966); Robinson, The Making of Administrative Policy: Another Look at Rulemaking and Adjudication and Administrative Procedure Reform, 118 U.Pa.L.Rev. 485, 490 (1970). One commentator who endorses the FTC's claim finds the legislative history considerably more ambiguous. *See*

and must reject the conclusion that they demonstrate a clear intent to preclude substantive rule-making. To us, they seem addressed to the issue whether the commission might have price-fixing power, a proposal that had been offered earlier in the initial House debates on the Covington bill and rejected. In the final debates Congressman Covington, the conference bill's floor manager, described "unfair methods of competition," the statutory standard, as a "vital, elastic principle," and suggested that it would be "expanded" much in the same manner as the law of negligence, fraud, and restraint of trade had been. However, he did not suggest that adjudication alone was the only means by which the commission would do so. *See* 51 Cong.Rec. (Part 15) at 14928.

But appellees argue that his subsequent comments demonstrate that this is clearly what he meant. True, in discussing the scope of judicial review of the commission's orders, he carefully differentiated the FTC's power to issue cease and desist orders from the ICC's power to order new railroad rates, suggesting that limited judicial review was appropriate in the latter case, but not in the former, since it was unquestioned at the time that the ICC, in prescribing rates, was performing an essentially "legislative" task, with immediate effect, while the FTC's essentially prohibitive orders followed adjudicatory proceedings and thus warranted more stringent review. In a quote relied upon by appellees, he went on to say:

"The Federal trade commission will have no power to prescribe the methods of competition to be used in future. In issuing its orders it will not be exercising power of a legislative nature. The basis, therefore, upon which the validity of the 'narrow' court review provided by the Hepburn Act rests will be lacking.

"The function of the Federal trade commission will be to determine whether an existing method of competition is unfair, and, if it finds it to be unfair, to order the discontinuance of its use. In doing this it will exercise power of a judicial nature. Under the Constitution power to act finally in a judicial capacity can be conferred only upon a court. * * * " *Id.* at 14932.

We do not believe this quote forecloses the Commission's claim here. For the power to frame substantive rules, in the context of the FTC, is hardly tantamount to the ICC's power to issue *orders* specifying the prices railroads must thereafter charge. The rules the FTC proposes to issue are not ICC-type orders operating immediately on a designated class of parties at all. They are merely norms which, in the absence of agency-brought proceedings to enforce them, have no legal effect whatever. This is not even a case where the rule alone is determinative of a business' rights without more, as in United States v. Storer Broadcasting Co., 351 U.S. 192, 76 S.Ct. 763, 100 L.Ed. 108 (1956), where applicability of the rule meant that rights to a hearing on additional television licenses might well be cut off. Nor is this a case where a party is penalized in the event he loses at either the FTC or the appellate review level. At this point he may comply and avoid further liability. In other words, there is ample opportunity to test the rule in advance of penalty proceedings. *Compare* Oklahoma Operating Co. v. Love, 252 U.S. 331, 40 S.Ct. 338, 64 L.Ed. 596 (1920); Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). Here, the practical efficacy of the rule depends on further Commission action through a complaint, hearing, findings, and order, and then judicial review. Thus, while the kind of rules the FTC may issue may properly be denominated "legislative" in the sense that once they are approved by reviewing courts they

Wegman, Cigarettes and Health: A Legal Analysis, 51 Corn.L.Q. 678, 742–746 (1966). *See also* Note, FTC Substantive Rulemaking: An Evaluation of Past Practice and Proposed Legislation, 48 N.Y.U.L.Rev. 135, 139–142 (1973).

state binding propositions of law, they are not exercises of "power of a legislative nature" in the ICC sense in which Congressman Covington was plainly speaking.

This view of Congressman Covington's remarks is buttressed by a reading of one of the cases on which he relied to rebut arguments that the grant of power to the commission to enforce and elaborate the standard of illegality was an unconstitutional delegation of legislative power. United States v. Grimaud, 220 U.S. 506, 31 S.Ct. 480, 55 L.Ed. 563 (1911), upheld a criminal prosecution for a violation of regulations promulgated by the Secretary of Agriculture under the Forest Reserve Act. Entrusted with the duty under the statute of safeguarding the public forest reserves, the Secretary was empowered by the statute to make regulations controlling access to the reserves and activities carried on in them, violations of which were to be criminally punishable. Although the power to declare what amounted to substantive criminal law was plainly unusual, the Supreme Court upheld the regulations, pointedly arguing that they were to be considered "administrative" rather than "legislative" and thus lawful:

"That 'Congress cannot delegate legislative power [to the President] is a principle universally recognized as vital to the integrity and maintenance of the system of government ordained by the Constitution.' Field v. Clark, 143 U.S. 649, 692 [12 S.Ct. 495, 36 L.Ed. 294, 309]. But the authority to make administrative rules is not a delegation of legislative power, nor are such rules raised from an administrative to a legislative character because the violation thereof is punished as a public offense.

\* \* \* \* \* \*

"The Secretary of Agriculture could not make rules and regulations for any and every purpose. \* \* \* [A]ll relate to matters clearly indicated and authorized by Congress. The subjects as to which the Secretary can regulate are defined. \* \* \*"

220 U.S. at 521–522, 31 S.Ct. at 484–485. See also Union Bridge Co. v. United States, 204 U.S. 364, 385–387, 27 S.Ct. 367, 51 L.Ed. 523 (1907) (upholding authorization to Secretary of War to order bridge improvements under the 1899 Rivers and Harbors Act and criminal prosecution for refusal to obey his order). These cases, on which Covington relied in his discussion distinguishing the FTC from the ICC, see 51 Cong.Rec. (Part 15) at 14932–14933, indicate clearly that, to the extent the FTC might have rule-making power, a specific question to which he did not address himself, this power would certainly be categorized in the parlance of the time as "administrative" rather than "legislative," a rubric whose meaning at the time was confined to the rate-making function. See Prentis v. Atlantic Coast Line Co., 211 U.S. 210, 226–227, 29 S.Ct. 67, 53 L.Ed. 15 (1908), another case noted in Covington's discussion. 51 Cong.Rec. (Part 15) at 14932–14933. Thus we believe we are on solid ground in concluding that Covington's remarks, when understood in light of the legal assumptions that clearly bound him, should not be read as either an implicit or an explicit denial of the kind of substantive rule-making power at issue before us.

Appellees also rely heavily on a colloquy between Congressman Sherley of Kentucky and Congressman Stevens of Minnesota, reprinted in the footnote below.[19] Their discussion seems most accurately interpreted much as we have interpreted Congressman Covington's. In both cases the reference point of comparison was the ICC's power to issue affirmative orders specifying future rates.

19. Mr. STEVENS of Minnesota. \* \* \* The Supreme Court has held that the Interstate Commerce Commission does exercise the right of determining whether a rate in existence is unreasonable or unjust. That is a quasi-judicial act and the decision of the commission on that point is reviewable by the courts, because it is a review of a legal decision upon a given state of facts. But when the commission goes further and decides what must be a reasonable

As we said earlier, substantive rules of the kind at issue here are not to be compared with definitely binding ICC rate orders. They are merely preliminary guidelines for business behavior on the basis of which, after the facts are found and no basis for waiver is established, the Commission may issue prohibitory cease and desist orders. While it is true that the Administrative Procedure Act today lumps together the kinds of rules the FTC proposes to issue and "the approval or prescription for the future of rates" under the denomination "rule," 5 U.S.C. § 551(4) (1970), it is clear that the understanding of those who focused on the question in 1914 saw a clear distinction between them. Thus we decline to conclude that the clear references in the final House floor debate to the ICC's rate-making power should be extrapolated to cover the issuance of substantive rules enforceable only in agency adjudication. The utterly unhelpful quality of the floor comments is underscored by Congressman Stevens' remarks. If one ignores the "legislative"—"administrative" technical distinction which influenced Covington and utilizes a more practical, broader conception of "legislative" type activity prevalent today, they can be read to support substantive rule-making of the kind asserted by the agency:

"This measure, for the first time in this country, attempts an administra-

rate or practice for the future, of course that is a legislative act which must not and can not be reviewed by the courts any more than could an act of Congress be so reviewed. There is that distinction, and we have carried that distinction into this bill. Whenever the trade commission decides that a certain act is an act of unfair method of competition, the decision on that point as a question of law is, and ought to be, reviewable by the courts. The facts themselves are found by the commission. Its finding as to the facts is conclusive. Its opinion as to whether that state of facts constitutes an act violating the law is its judgment of law upon the facts and its judgment is and ought to be reviewed, and it is so provided by this bill.

\*     \*     \*     \*     \*

tive regulation of commerce itself. We have regulated the instrumentalities such as transportation and finance, but here we attempt to rule and help commerce. An executive alone with power of enforcement merely, or even a wise discretion, could not do it. The courts under their ruling could not wisely and liberally accomplish the needed results. *The legislative branch can only prescribe rules for the future. It requires a combination of all those powers in one organization, with the highest obtainable talent well and thoroughly to work out the difficult problems which will be met.* Because it is in a sense permanent and without partisanship, and can lay down a policy which can be pursued or changed as may be wise and necessary, without the charge of personal or political advantage, must this important commission perform such work."

51 Cong.Rec. (Part 15) at 14939. (Emphasis added.)

Thus the history of the pertinent 1914 debates leaves us with a few affirmative indications that Section 6(g) encompassed substantive rule-making and a few cryptic indications that this is not so. As a consequence, the need to rely on the section's language is obvious.

Mr. SHERLEY. If the gentleman will permit, the Federal trade commission differs from the Interstate Commerce Commission in that it has no affirmative power to say what shall be done in the future?

Mr. STEVENS of Minnesota. Certainly.

MR. SHERLEY. In other words, it exercises in no sense a legislative function such as is exercised by the Interstate Commerce Commission?

Mr. STEVENS of Minnesota. Yes. The gentleman is entirely right. We desired clearly to exclude that authority from the power of the commission. We did not know as we could grant it anyway. But the time has not arrived to consider or discuss such a question.

51 Cong.Rec. (Part 15) 14938 (1914).